# EXHIBIT A

1
2
3
4
5

6                        SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

7    M.H., a minor; C.H., a minor; SOPHIE            NO.
     HARTMAN, individually and as a parent of
8    C.H. and M.H.,                                  **COMPLAINT**

9              Plaintiffs,
                                                     **DEMAND FOR JURY TRIAL**
10        v.

11   STATE OF WASHINGTON DEPARTMENT
     OF CHILDREN, YOUTH AND FAMILIES
12   ("DCYF"); KELSEY OWENS, DCYF
     Investigator; LAUREN MAULDEN, DCYF
13   Case Worker; CITY OF RENTON POLICE
     DEPARTMENT ("CRPD"); ADELE
14   O'ROURKE, CRPD Detective;
     WASHINGTON COURT APPOINTED
15   SPECIAL ADVOCATE ASSOCIATION
     ("CASA"); VIRGINIA WHALEN; SEATTLE
16   CHILDREN'S HOSPITAL; REBECCA T.
     WIESTER, M.D.; MARK S. WAINWRIGHT,
17   M.D., Ph.D.; TIMOTHY J. BREI, M.D.;
     LUSINE AMBARTSUMYAN, M.D.; HELEN
18   L. DICHEK, M.D.; NANCY CHASE, B.S.N.,
     R.N.; BETH WEBB NAUERT, M.D.; and
19   JOHN and JANE DOES 1-10,
20             Defendants.
21
22

23        Plaintiff Sophie Hartman, on her own behalf and on behalf of her minor children, M.H.

24   and C.H., as their mother and next friend (collectively, the "Hartmans"), file this Complaint

25   against Defendants State of Washington Department of Children, Youth and Families ("DCYF"),

COMPLAINT - 1                                          **Williams, Kastner & Gibbs PLLC**
                                                       601 Union Street, Suite 4100
                                                       Seattle, WA 98101-2380
                                                       (206) 628-6600

7865882.1

1   Kelsey Owens, Lauren Maulden, Adele O'Rourke, City of Renton Police Department ("CRPD"),

2   Washington Court Appointed Special Advocate Association ("CASA"), Virginia Whalen,

3   Seattle Children's Hospital ("SCH"), Rebecca T. Wiester, M.D., Mark S. Wainwright, M.D.,

4   Ph.D., Timothy J. Brei, M.D., Lusine Ambartsumyan, M.D., and Helen L. Dichek, M.D., Nancy

5   Chase, BSN, RN, Beth Webb Nauert, M.D., and John and Jane Does 1-10,[1] for damages based

6   upon the Hartmans' personal knowledge, upon information and belief as to all other matters, and

7   with the belief that all matters alleged herein will have evidentiary support after a reasonable

8   opportunity for further investigation and discovery.

## I.   **INTRODUCTION**

10      1.      The Hartmans were the victims of a system of secrecy and unchecked authority

11  without accountability, which led to the separation of the Hartman family based on false and

12  outrageous claims of child abuse or neglect of C.H.  For two years, several Defendants secretly

13  set the family up based on wild and evidence-free allegations of abuse or neglect, and misused

14  the family's trust in medical professionals to forcibly remove the children from their mother

15  Sophie's care.  While preparing misleading claims of child abuse and criminal charges, numerous

16  Defendants took their leisurely time and accessed medical records to create a contrived narrative

17  that Sophie had manufactured a complex medical condition to gain attention for her own

18  dysfunctional psychiatric need.  The problem is the child's condition was real, was validated by

19  medical experts, and the supposed "child abuse medicine" claims (and false diagnosis of

20  Sophie's pathology) were a vehicle for attention for misguided licensed professionals, who

21  themselves wanted attention and were willing to contrive a fake condition to get it.

22      2.      The result on the Hartman family has been devastating.  The family was

23  separated, Sophie was falsely charged with criminal conduct, both children have been harmed

24  immensely, and several Defendants have insisted that they continue to have involvement in

_____

[1] Plaintiffs reserve all right to plead against others.

COMPLAINT - 2

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1   controlling the family's medical care.  After having blocked proper care and causing immense

2   trauma, Defendants have doubled down on their misconduct, inverting the concept of informed

3   consent or the precept of the Hippocratic Oath of "First, Do No Harm."  To defend against false

4   medical accusations and a myriad of violations of professional standards, the Hartman family

5   has spent millions of dollars on lawyers just to keep the family together and Sophie out of jail.

6   The actual harm to the family is vast and the spirit of subversion and hubris with which various

7   Defendants betrayed the Hartman family is shocking.

8          3.     C.H. has Alternating Hemiplegia of Childhood ("AHC") and other health

9   conditions.   C.H.'s AHC is a serious and rare condition that was diagnosed by the world's

10  leading expert in the field, Mohamad A. Mikati, M.D., of Duke University Health System ("Duke

11  University"), long before Defendants had met C.H.  SCH doctors and staff abused C.H. by failing

12  to treat or coordinate care for this rare disorder, and instead denied her care for AHC while

13  "diagnosing" that Sophie was making the condition and symptoms up, apparently thinking she

14  was also duping Duke University experts, Dr. Mikati, and many other medical professionals.

15         4.     Sophie sought help for her child at SCH.  Being a loving and engaged mother,

16  she requested SCH providers to coordinate with AHC experts at Duke University.  The SCH

17  providers at first acknowledged that this was critical for C.H.'s care, and they included Dr.

18  Mikati.  However, SCH providers later, for reasons that elude any logic, secretly decided that

19  Sophie was malignly harming her child by conjuring the very real AHC condition, refused to

20  coordinate care with actual specialized experts, and faulted Sophie for providing "fragmented"

21  care for C.H., culminating in an attack through false claims and criminal charges and media

22  defamation.

23         5.     SCH involved the Safe Child and Adolescent Network ("SCAN"), without any

24  consent, an internal team purportedly devoted to rooting out child abuse and neglect with claimed

25  experts in "child abuse medicine."  This special team, which neither C.H. or Sophie, nor any

COMPLAINT - 3

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1   other person on their behalf, ever gave consent to intrude into their private medical care, medical

2   records, or care decisions (and which never even disclosed its involvement until making lurid

3   accusations), devised the nonsensical theory that Sophie was causing harm to her own beloved

4   child.   Members of the SCAN team and numerous other Defendants schemed behind the

5   Hartmans' backs during almost two years of secret surveillance.   They created secret medical

6   records documenting their fantastical theory and formed plans to separate the family.   They kept

7   these secret records separate from C.H.'s other accessible medical records, as if they were the

8   real decisionmaker, an assumption of superior control over the family, ousting the true parent.

9   They laid the groundwork for an accusation of medical child abuse for two years, a false claim

10  that was slow-rolled while they gradually set the family up to be separated with false criminal

11  charges, horrifying publicity, and removal of the children, based on a contrived rush two years

12  later to court for a phony emergency.   They ignored or disregarded internal professional insight

13  from C.H.'s SCH providers and from experts and other medical providers.   The sad irony is this

14  attention-seeking by medical professionals tracks onto the false claims that they made against

15  *Sophie* of harming children to get attention.

16          6.      For two years, SCAN members surveilled the family's medical care, interfered

17  by blocking proper care, and misused information provided only for informed-consent medical

18  care (not subversion).   These licensed professionals referred Sophie to DCYF, falsely claiming

19  that Sophie had advocated for unnecessary medical procedures for C.H. due to her supposed

20  Munchausen Syndrome by Proxy.   But each of C.H.'s medical interventions were consented to

21  by Sophie on behalf of C.H. only after these interventions were considered, recommended to

22  Sophie, and performed by real-life physicians with real-life expertise exercising independent,

23  professional judgment.   As was the case with each medication that C.H. took, each was

24  recommended, prescribed, and monitored by medical professionals, – in no instance did Sophie

25  do anything other than what was recommended by licensed medical professionals.   In their

COMPLAINT - 4

7865882.1

1   heedless rush to be at the center of their own medical drama, several Defendants ignored and

2   trampled common sense and their duties to the Plaintiffs, and caused serious harm.

3       7.       This led to an enormously harmful series of events, all arising from the senseless

4   rush of numerous Defendants who are charged with doing things like investigating, and

5   considering facts, medical expertise, and common sense, that fueled a witch-hunt against the

6   Hartman family, and Sophie in particular.

7       8.       This led to the taking of the children in a police raid, the charging of Sophie

8   criminally in a maximally humiliating way, various strangers rifling through Sophie's private

9   prayer journals and every personal confidence to sift devious motives from a loving mother's

10  agony at trying to help her suffering child, and extensive other Orwellian intrusions.  Cherry-

11  picked pages from those prayer journals were then used openly in court to attempt to paint a

12  picture that she was an abusive mother.  This led to a media frenzy that painted Sophie as an

13  abusive mother who made up that her child was ill for attention.  The media reported, for

14  example, that Sophie "went on a PR tour for her sick, adopted African child" and that she, was

15  a "white, Jesus-loving former missionary" who strapped her "little Black girl born in Zambia"

16  into a wheelchair, among other outrageous and greatly humiliating statements about Sophie

17  which were entirely false.  This also led to death threats against Sophie, forcing her to flee from

18  her home and hide in a hotel for safety.  Numerous defendants contorted facts, manipulated and

19  hid evidence, and outright lied, using extensive funds supplied by the State, the family's very

20  own medical insurance, and federal government funds to try to destroy the Hartman family.

21      9.       Sophie had to call on her parents to borrow funds to hire counsel that actually got

22  to the bottom of the gaslighting.  Despite a very stacked deck and the State's overwhelming

23  resources, the family used excellent counsel to bring out the truth and outflank the Defendants'

24  refusal to admit how wrong they were in their dug-in position.  The Hartman family won.  The

25  family was separated for 492 days, each member suffered great harm, and it cost millions of

COMPLAINT - 5

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1   dollars in attorneys' fees, costs, and negative tax consequences from premature asset liquidation

2   to stave off the attack.  After those 492 days, the family proved what had been clear to real

3   experts and common sense all along – that there was no abuse and Sophie had given her all to

4   protect her children.

5       10.     DCYF brought a "dependency action," a legal term for an attempt to take away

6   children and destroy a family, based on claims of abuse.  It failed.  The dependency court

7   concluded after 49 days of trial that "SCH's SCAN process was deeply flawed."  Sophie regained

8   custody of M.H. and then C.H.  Even then, not a single Defendant expressed any contrition or

9   amends (and they continue now to do the same to other families).  Instead, using the coercion of

10  criminal charges that they released only when the family would "agree," Defendants, including

11  licensed medical professionals, insisted that SCH serve as the source of C.H.'s medical care

12  through December 1, 2023.  For 990 days, from March 17, 2021, until December 1, 2023, Sophie

13  was forced to use SCH to care for C.H., the very institution that tore the Hartman family apart,

14  failed to care for C.H., and did enormous medical, psychic, and moral harm.  This abusive farce

15  was an inversion of the basics of medicine and law in a free society.  It entailed a range of

16  violations from unconsented battery, negligence, defamation, violation of privacy rights, and

17  others.

18      11.     The misconduct of each Defendant contributed to the massive harm in various

19  ways, from prime movers who abused patient confidentiality and medical records who devised

20  a wild story from whole cloth, to investigators who have a duty to investigate and not become

21  mob participants.  The Hartman family's remaining recourse, now that coercive misuse of

22  criminal charges is past and the family is together without improper intrusion, is to seek justice

23  by a jury trial and exposure of this systematic misconduct.

24

25

COMPLAINT - 6

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

## II.     JURISDICTION AND VENUE

12.     The Court has personal jurisdiction over Defendants pursuant to RCW 4.28, *et seq.*, and RCW 4.28.185 because the acts alleged concern the commission of tortious acts within the State of Washington.

13.     Venue is proper in King County pursuant to RCW 4.12, *et seq.*, because Defendants engaged in the conduct set forth in this Complaint in King County and elsewhere in the State of Washington and because one or more of the Defendants reside in King County.

## III.     PARTIES

14.     Sophie Hartman is a natural person residing in the State of Washington.

15.     C.H. Hartman is a minor, and a natural person residing in the State of Washington.

16.     M.H. Hartman is a minor, and a natural person residing in the State of Washington.

17.     The State of Washington (the "State") is a Defendant in this matter due to the actions and omissions of its agency, the DCYF.  DCYF is a Washington state agency with a principal place of business at 805 156th Avenue NE, Bellevue, Washington 98007.

18.     Kelsey Owens is an Investigator with the DCYF with a business address of 1313 West Meeker Street, Suite 102, Kent, Washington 98032.

19.     CASA is a Washington nonprofit corporation (currently listed in delinquent business status) with a business address of 27701 NE 212th Avenue, Battle Ground, Washington, 98604.

20.     Virginia Whalen is a CASA staff guardian *ad litem* with the King County Dependency Court Appointed Special Advocates program with a business address of 1211 East Alder Street, Suite 4100, Seattle, Washington 98122.

21.     Lauren Maulden is a Social Service Specialist III with the DCYF with a business address of 1313 West Meeker Street, Suite 102, Kent, Washington 98032.

COMPLAINT - 7

22.     Adele O'Rourke is a Detective with the CRPD with a business address of 1055 South Grade Way, Renton, Washington 98057.

23.     CRPD is an agency of the City of Renton, a Washington municipality, and has a business address of 1055 South Grade Way, Renton, Washington 98057.

24.     SCH is a nonprofit corporation with a principal place of business at 4500 40th Avenue NE, Seattle, Washinton 98105.

25.     Rebecca T. Wiester, M.D., is the Medical Director at SCH's Protection Program, with a business address of 325 9th Avenue, Seattle, Washington 98104.

26.     Mark S. Wainwright, M.D., Ph.D., is a pediatric neurologist at SCH with a business address of 4800 Sand Point Way NE, Seattle, Washington 98105.

27.     Timothy J. Brei, M.D., is a neurodevelopmental pediatrician at SCH with a business address of 4800 Sand Point Way NE, Seattle, Washington 98105.

28.     Lusine Ambartsumyan, M.D., is the Interim Director of Endoscopy at SCH with a business address of 4800 Sand Point Way NE, Seattle, Washington 98105.

29.     Helen L. Dichek, M.D., is a physician in the Endocrinology Department at SCH with a business address of 4800 Sand Point Way NE, Seattle, Washington 98105.

30.     Nancy Chase, BSN, RN, is a nurse at SCH with a business address of 4800 Sand Point Way NE, Seattle, Washington 98105.

31.     Beth Webb Nauert, M.D., is a former pediatrician at Healthpoint Auburn, with an address of 126 Auburn Avenue, Suite 300/400, Auburn, Washington 98002, and SCH with a business address of 4800 Sand Point Way NE, Seattle, Washington 98105.

## IV.     FACTUAL ALLEGATIONS

### A.     Sophie Hartman's Adoption of C.H. and M.H. and C.H.'s Medical History.

32.     Sophie Hartman ("Sophie"), is a loving, single mother, who adopted two daughters, biological half-sisters, C.H. and M.H. from Zambia.

COMPLAINT - 8

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

33.     M.H. was placed with Sophie in August 2011 after being taken to an orphanage when M.H. was eight months old during a time when Sophie was a resident in Zambia, Africa, where she had been working for a charitable non-government organization since 2010.

34.     In July 2014, three-week-old C.H. was also taken to the same orphanage, and placed with Sophie as well in order to keep the siblings together.

35.     The adoptions of both C.H. and M.H. were finalized in May 2015.

36.     Sophie adopted both C.H. and M.H. to be able to care for them and allow them to grow up together.  Sophie wanted to be able to provide them with a life that they would not otherwise have, while also keeping them closely connected to their birth culture.

37.     It was known when Sophie adopted C.H. and M.H. that their biological mother had a history of mental health issues and substance abuse.

38.     Sophie observed during her visits to the orphanage that C.H. had a history of shaking and crying, which Sophie believed to be caused by substance abuse withdrawal.  From birth, Sophie noticed that C.H. had deficits including, for example, cognitive impairment, developmental delay, and gastrointestinal issues, that would affect different body systems in an episodic fashion.

39.     After both adoptions were finalized in May 2015, Sophie decided it would be in the best interest of her daughters to move the family to the United States in order to access quality medical care for C.H., and to have her assessed to determine what medical care would be best for her.

**B.     In 2016 C.H. Is Diagnosed with Static Encephalopathy and Cerebral Palsy by SCH, Is Prescribed Orthotics, and Begins Therapy.**

40.     After the family moved to the State of Washington, Sophie proactively collaborated with physicians to provide C.H. with the medical care she needed.  C.H.'s initial

COMPLAINT - 9

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    care was primarily provided by Julian K. Davies, M.D., of the University of Washington Center

2    for Adoption Medicine.  Dr. Davies became C.H.'s primary care physician ("PCP").

3            41.     While serving as C.H.'s PCP, Dr. Davies told Sophie that she was a supportive

4    advocate for her daughters and took great care of them, including by proactively providing

5    appropriate medical treatment for C.H.

6            42.     In the fall of 2015, given C.H.'s complicated symptoms that Dr. Davies described

7    as symptoms of neurological problems, C.H. was referred by Dr. Davies to SCH for evaluation

8    by Catherine E. Otten, M.D., an SCH neurologist.

9            43.     In August 2016, C.H. underwent an evaluation and magnetic resonance

10   imaging ("MRI"), which showed abnormal results.  Those results led Dr. Otten to diagnose C.H.

11   with static encephalopathy, a chronic brain disorder, and cerebral palsy with left hemiplegia.

12           44.     The objective findings from C.H.'s MRI showed white matter charges which

13   could help explain why C.H. showed left-sided weakness affecting her ability to walk.  Dr. Otten

14   then referred C.H. to an SCH physical therapist ("PT"), Solveig Hart, to address the need for

15   ankle-foot orthotics ("AFOs") in light of C.H.'s cerebral palsy diagnosis.

16           45.     In September 2016, Dr. Davies prescribed AFOs for C.H., which appeared to

17   significantly improve her mobility.

18           46.     Dr. Davies also referred C.H. to Kindering for early intervention services

19   including occupational, physical, feeding, and oral therapy.  The therapists at Kindering observed

20   that C.H. had speech delays, feeding issues, and other symptoms that they documented.

21           47.     Dr. Davies, based on the observations of the therapists at Kindering, also referred

22   C.H. for a swallow study at SCH done by Carla D. Neiss, Speech Language Pathologist ("SLP").

23   This testing showed that C.H. had a delay in swallow initiation and Ms. Neiss concluded that

24   C.H. "is considered at risk for possible aspiration due to her delay in swallow initiation, deep

25   and frequency of laryngeal penetration."

COMPLAINT - 10

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

48.     This information was brought to Dr. Davies by Sophie.  Dr. Davies discussed with SCH providers the idea of a gastrostomy tube ("G-Tube"), which SCH providers initially indicated they disagreed with, although they later recommended it.

49.     C.H. continued to have oral and feeding therapy at Kindering, but suffered from vomiting.

50.     Dr. Davies then referred C.H. for a gastrointestinal evaluation at SCH due to Sophie's ongoing concerns about C.H.'s frequent vomiting, documented by numerous physicians.

51.     In 2016 C.H. was hospitalized at SCH to observe her vomiting.  It was observed and documented, although there was disagreement at SCH as to the cause of the observed vomiting.  This disagreement caused concern to Sophie, who wanted to understand the underlying cause of C.H.'s symptoms so that they could be directly addressed rather than just continuing to treat the symptoms, and she voiced her concern to Dr. Davies.

52.     In October 2016, the Hartman family moved to Lynden, Washington.  They moved to Lynden to be closer to a community of adoptive families of international children with complex needs to provide C.H. with additional support.  They also moved due to the decreased cost of living.  At that time, C.H.'s primary care was transitioned to David Pavlik, D.O., at PeaceHealth Pediatric Clinic, although C.H. continued to travel to Seattle to see providers at SCH.

53.     Shortly after moving to Lynden, Washington, Sophie received referrals for C.H. to enroll in physical therapy, occupational therapy, and speech therapy.  Sophie enrolled C.H. at Kornerstone Kids, where C.H. had therapy three times a week until September 2019.[2]  Beginning in August 2017, Bryce Blaser, DPT, and Jen Burnett, PTA, became C.H.'s physical therapists at

---

[2] Like with Kindering, therapists at Kornerstone Kids documented significant fluctuations in C.H.'s symptoms, including episodic inability to speak, difficulty with gross motor skills and strength, and cognitive regression, among other symptoms.

COMPLAINT - 11

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

Kornerstone Kids, who made independent recommendations for mobility equipment such as additional AFOs, an adaptive stroller, and a wheelchair.

54.     In December 2016, C.H. underwent an electroencephalogram ("EEG"), a test of brain activity, to assess the electrical activity in C.H.'s brain.

55.     The EEG was analyzed by Christopher W. Beatty, M.D., who found that C.H. had focal epileptiform discharges (spike waves in brain activity) in sleep, which were abnormal and put her at risk for seizures.

56.     Based on this EEG result, SCH neurologist Monica K. Samelson, M.D., and Dr. Brei, recommended that C.H. start taking Trileptal (oxcarbazepine), an anti-seizure medication. Sophie agreed, based on the recommendation of the medical staff at SCH, and SCH immediately started C.H. on Trileptal.  C.H.'s taking of oxcarbazepine would later be called "worrisome" by Dr. Wiester, who reported Sophie to DYCF, but it was prescribed by providers at SCH based on objective medical tests reflecting that C.H. was at risk of seizures.

57.     With each additional recommendation for testing and therapeutic intervention, as well as diagnosis of C.H. provided by C.H.'s providers, Sophie did everything she could to assist C.H. and permit her to be as healthy and comfortable as she could be.  It would later become clear that, faced with observable evidence of actual symptoms that fit with an expert diagnosis that explained them, Dr. Wiester, Dr. Ambartsumyan, Dr. Brei, Dr. Wainwright, and Nurse Nancy Chase instead decided that Sophie was contriving the symptoms, which was illogical, bad medical practice, and enormously harmful.

**C.     After C.H.'s Symptoms Fail to Improve in 2016 and 2017, Sophie is Forced to Get a Second Opinion after SCH Dismisses Sophie's Concerns, which Leads to a Diagnosis of AHC.**

58.     In late 2016 and early 2017, Sophie began to notice that the medical providers at SCH who had intermittent interactions with C.H. often questioned Sophie's observations of her daughters, and those of Dr. Davies (C.H.'s PCP), who saw C.H. regularly.

COMPLAINT - 12

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

59.     For example, when Sophie raised concerns or described the symptoms that she had observed in C.H., those concerns were met with an unwillingness to engage with Sophie to learn more about C.H. and determine the underlying cause of her symptoms.  Sophie was told C.H.'s symptoms were not likely to change (aligned with a diagnosis of static encephalopathy and cerebral palsy), yet Sophie frequently observed changing symptoms, which did not appear to be consistent with the diagnosis provided by SCH doctors.  When Sophie brought this to the attention of SCH doctors and questioned whether there may be an underlying cause of C.H.'s symptoms or urgent care needed, SCH staff dismissed Sophie's concerns and implied that she was overreacting.  They even refused to review videos that Sophie presented to them of C.H. actually exhibiting various distinctive medical symptoms.

60.     Based on SCH's dismissal of Sophie's observations and the unanswered questions and disagreement in diagnosis among SCH providers, Sophie asked for a second opinion of what the medical providers at SCH had told her about C.H.'s diagnoses.  Dr. Pavlik referred C.H. to specialists at Mary Bridge Children's Hospital ("Mary Bridge").  Sophie had every right to seek a second opinion to ensure that C.H. was being provided appropriate care, and it was in C.H.'s best interest.

61.     Sophie's experience with the doctors at Mary Bridge was vastly different from her experience with SCH's doctors.  Rather than dismissing Sophie's observations of C.H. and her concerns about C.H.'s changing symptoms, the staff at Mary Bridge took a considered approach to C.H.'s medical care in order to determine the root cause of her symptoms in order to provide C.H. with the best possible care.  The doctors at Mary Bridge showed genuine curiosity, interest, and empathy in C.H.'s fluctuating symptoms and in finding the cause for them. They engaged with Sophie when she brought them objective evidence of the symptoms she was observing, such as videos of C.H. experiencing various symptoms.

COMPLAINT - 13

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

62.     In March 2017, C.H. was evaluated by a Gastroenterologist, Michael K. Pickens, D.O., of Mary Bridge.[3]

63.     After evaluating C.H., Dr. Pickens directed that C.H. be administered a gastric emptying test by Bradley W. Fehrenbach, M.D., of Mary Bridge, which demonstrated that C.H. had markedly slow gastric emptying.  Dr. Pickens diagnosed C.H. with gastroparesis, which is slowed or ineffective stomach motility.

64.     Dr. Pickens also referred C.H. to his Mary Bridge colleague, Stephanie P. Acierno, M.D., a pediatric surgeon, to discuss the possible placement of a G-Tube (which had been previously rejected by SCH).

65.     C.H. also saw Majeed Al-Mateen, M.D., a neurologist at Mary Bridge.

66.     Both Dr. Al-Mateen and Dr. Pickens referred C.H. to Amy E. Yuen, M.D., a genomics physician at Mary Bridge, for additional testing.

67.     Dr. Yuen performed genetic testing, which showed a variant of the ATP1A3 gene associated with AHC, a rare neurological condition causing recurrent but intermittent episodes of temporary paralysis, often affecting one side of the body.

68.     This was the first time Sophie had been made aware of AHC.  Based on the genetic analysis, fluctuating symptoms, diagnosis of epilepsy from SCH, and videos of C.H. that Sophie provided to Dr. Yuen at Dr. Yuen's request, Dr. Yuen considered AHC as a possible diagnosis.

### 1.   *Staff at Mary Bridge Recommend Placement of a G-Tube*

69.     Drs. Pickens, Yuen, and Acierno agreed that it was appropriate to proceed with the previously recommended G-Tube placement due to concerns about the safety of oral intake during C.H.'s AHC episodes and to support C.H. in maintaining adequate hydration.   The

---

[3] In August 2017 C.H. also began seeing Dawn Burgess, SLP, at Kornerstone Kids twice a week for speech therapy.

COMPLAINT - 14

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

physicians agreed that slow continuous feeds through a G-Tube, either nightly or when C.H.'s oral intake was decreased, could help her to avoid AHC episodes.

70.     Sophie accepted these recommendations, and Dr. Acierno surgically placed the G-Tube in C.H. in July 2017.  The G-Tube was not meant to be C.H.'s sole source of nutrition or hydration, especially because C.H. enjoyed eating and was capable of eating orally.

71.     Given that AHC is a rare disease, Mary Bridge did not have any specialists who were knowledgeable about or had experience with this disease, so  Dr. Yuen took the initiative to research the disorder and learned that the best experts on the disease were at Duke University.  Dr. Yuen then referred C.H. to Duke University to confirm her provisional diagnosis and guide C.H.'s care at Mary Bridge.

72.     After learning of the AHC diagnosis, Drs. Al-Mateen, and David Brunelle, M.D., by whom C.H. had also been evaluated at Mary Bridge, took the initiative to learn about resources for AHC patients as well as their families, including an AHC patient support network called Cure AHC, an organization that supports families who are caring for family members diagnosed with AHC.  At their recommendation, Sophie connected with Cure AHC.

### 2.   *Sophie Learns of Duke University's AHC Program and C.H.'s Diagnosis of AHC is Confirmed*

73.     After discussing the issue with the President of Cure AHC, Sophie learned of Dr. Mikati of Duke University's Department of Pediatrics, one of the world's top AHC specialists.

74.     In mid-2017, Sophie met with Dr. Mikati by phone for an initial screening.  After Dr. Mikati asked questions about C.H. and her symptoms, Dr. Mikati indicated that he believed that C.H. did have AHC and recommended she be evaluated at Duke University.

75.     In April 2018 C.H. had the first of several comprehensive, multi-day evaluations at the Duke University multi-disciplinary AHC program, where her AHC diagnosis was confirmed.  Dr. Mikati's diagnosis was based on an independent evaluation of C.H. including

COMPLAINT - 15

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

direct evaluation by Dr. Mikati and his colleagues from the following specializations: cardiology, sleep medicine, gastrointestinal, neurodevelopmental medicine, neuropsychology, neurology, physical therapy, speech therapy (with a swallow evaluation), occupational therapy and nutrition. Dr. Mikati's diagnosis was also informed by the evidence of C.H.'s symptoms presented by Sophie.

76.     According to Dr. Mikati, common episodic symptoms of AHC include diarrhea, constipation, hemiplegia, dystonia, abnormal eye movements, chorea, epilepsy, and reduced awareness spells, which symptoms can fluctuate and sometimes improve.

77.     C.H.'s symptoms were observed at Duke University by Dr. Mikati and his colleagues and were documented.  For example, one physical therapist at Duke University observed hemiplegia or weakness and dystonia on C.H.'s left side.  Dr. Mikati also documented left hand and left facial weakness.  Dr. Mikati later noted that C.H.'s EEG from SCH showed epileptic discharges, which supported his AHC diagnosis, as 50% of AHC patients have epilepsy.

### 3. *C.H. Is Referred Back to SCH, and SCH Recommends Placement of a Cecostomy Tube*

78.     In June 2018, the Hartman family decided to move to Renton, Washington, to be closer to M.H.'s gymnasium, as she had become a nationally-ranked gymnast, and closer to C.H.'s medical providers at Mary Bridge.

79.     That same month, a Mary Bridge gastroenterologist, Dr. Pickens, whom C.H. had been seeing for several years, referred C.H. to a gastrointestinal motility specialist, Dr. Lusine Ambartsumyan, at SCH for manometry testing.

80.     Dr. Pickens later referred C.H. to Dr. Ambartsumyan to take over her gastrointestinal care because Dr. Pickens was relocating out of Washington.  Dr. Pickens told Sophie that she should discuss with Dr. Ambartsumyan whether the placement of a cecostomy

COMPLAINT - 16

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    tube, through which liquid is injected to help induce and facilitate regular bowel movements,

2    could benefit C.H. in addressing her constipation.

3         81.    Dr. Ambartsumyan performed an antroduodenal manometry test (a test that

4    records the pressure waves produced in the stomach and small intestine) on C.H., to evaluate the

5    neuromuscular integrity of C.H.'s stomach and small intestine.  That test showed that C.H.'s

6    small intestine was abnormal with evidence of intrinsic neuropathy, abnormalities that were

7    consistent with nerve injury.  These results, in conjunction with the already diagnosed

8    gastroparesis (slow stomach emptying), appeared to explain the cause of C.H.'s difficulties with

9    feeding.

10        82.    Dr. Ambartsumyan's medical records reflect that she told Sophie multiple times

11   that C.H. might benefit from the conversion of her G-Tube to a gastrostomy-jejunostomy tube

12   ("G-J Tube"), which would provide for the supplemental tube feeds to go into her small intestine

13   instead of her stomach.

14        83.    Dr. Ambartsumyan's medical records also reflect that she spoke with Sophie

15   about the possibility that C.H. might become dependent on total parenteral nutrition ("TPN")

16   (complete nutrition delivered intravenously) because of the abnormality that was detected on the

17   antroduodenal manometry testing that had been performed.

18        84.    Due to C.H.'s ongoing constipation that had not responded to medications, Dr.

19   Ambartsumyan recommended the placement of a cecostomy tube to help C.H. with regular

20   bowel movements.

21        85.    Sophie continued to comply with all recommendations from C.H.'s medical

22   providers and therapists, including the one from Dr. Ambartsumyan regarding the placement of

23   a cecostomy tube, to see that C.H. had the best care.  Caitlin A. Smith, M.D., of SCH surgically

24   placed the cecostomy tube in December 2018.  After the cecostomy, C.H. no longer had to take

25

COMPLAINT - 17

MiraLAX and senna to try to manage her constipation, but instead engaged in a simple nightly routine to relieve her bowels.

86.     In late 2018, Dr. Al-Mateen advised Sophie that he was planning to retire in the near future, and he recommended that Sophie transition C.H.'s care back to SCH from Mary Bridge to facilitate the coordination of care with AHC experts at Duke University, as Mary Bridge had done.

87.     Because of this, the Hartmans would no longer have the support of the Mary Bridge medical team who had worked so constructively, proactively, and diligently to diagnose C.H.'s AHC and to coordinate with the AHC experts at Duke University in order to address her symptoms.  Sophie did not want to bring her daughter back to SCH, given that SCH had disregarded objective evidence of symptoms, failed to diagnose C.H. with AHC, and questioned Sophie's and C.H.'s PCP's observations of C.H.'s symptoms.  But she followed the advice of Drs. Pickens and Al-Mateen, and established C.H.'s care at SCH.

88.     At SCH, only one medical provider caring for C.H. had experience with AHC, in contrast with the doctors at Duke University, who are world experts in this rare disease.  Nor did the SCH medical providers coordinate C.H.'s care with the AHC specialists at Duke University as the doctors at Mary Bridge had.  This was the opposite of Sophie's experience with the doctors at Mary Bridge, who had closely coordinated with the AHC specialists at Duke University in order to manage C.H.'s AHC symptoms.  The transition of C.H.'s care to SCH led to the improper handling of her care, skepticism of Sophie's reporting of C.H.'s symptoms, and eventual false diagnoses and accusations causing the removal of C.H. from her family for 492 days in total.  This included total isolation from her family for 16 days during a forced hospitalization, without permission or consent under the guise of "concern" for C.H.

COMPLAINT - 18

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

**D.     SCH's Actions after Taking Over C.H.'s Care in 2019 Resulted in C.H. and M.H. Being Forcibly, and Wrongfully, Removed from Sophie's Care.**

89.     At an initial SCH care coordination conference, Dr. Ambartsumyan, Dr. Brei, Nurse Nancy Chase, and others agreed that: "To best serve C.H. . . . [they] . . . want to partner with C.H.'s PCP [her primary care provider, Dr. Pavlik] to maximize her care at home, support mother in her care and prevent ED visits and admissions." It was also agreed that SCH would collaborate with C.H.'s outside therapists. The notes from that meeting were provided to Sophie by Nurse Chase. Those notes stated that AHC is "a rare condition. SCH providers have limited to no experience with managing this condition."

90.     Despite this documented agreement to coordinate with C.H.'s primary care provider, Dr. Pavlik, and therapists at Kornerstone Kids, who had been successfully caring for C.H. for years, SCH systematically failed to follow through with the promised coordination of C.H.'s medical care. In fact:

    i.     SCH providers did not partner with C.H.'s primary care provider, Dr. Pavlik.

    ii.    Dr. Wainwright noted that he was aware C.H. was receiving physical, occupational, and speech therapy but never once spoke to her therapists;

    iii.   Dr. Mikati was only contacted in the months leading up to the report to DCYF, approximately 19 months later. During these conversations, the SCH physicians did not question the AHC diagnosis, nor did they share that they believed that Sophie was misrepresenting C.H.'s symptoms (though they did). Due to this conduct at SCH, C.H. received fragmented care, without the benefit of or guidance from the world-leading specialists in AHC at Duke University;

    iv.    Dr. Ambartsumyan never spoke with any provider at Duke University (despite Sophie providing her with Dr. Mikati's phone number) or C.H.'s primary care physician, Dr. Pavlik, who were essential to learning about her very real diagnoses;

    v.     SCH ignored efforts from Kornerstone Kids and Little Bit Therapeutic Riding Center to communicate regarding their direct observations of C.H. as to essential observables;

COMPLAINT - 19

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

vi.     SCH questioned Sophie's not bringing C.H. to the emergency department for a situation SCH believed that she could handle at home. They were secretly building a dossier against her as the true pathology, even though SCH had committed "to support mother in her care and prevent ED visits and admissions"; and

vii.     Nurse Chase effectively became Dr. Wiester's eyes and ears to provide surreptitious surveillance of C.H. and Sophie. Nurse Chase sent Dr. Wiester information about C.H.'s care without Sophie's knowledge or consent. Nurse Chase took her position as C.H.'s complex care nurse (and supposed advocate for C.H.) and used that to provide a steady stream of information to Dr. Wiester that she would otherwise not have been privy to and to which she was otherwise unauthorized to have access.

viii.     Dr. Wiester was never introduced or consented to by the family. She secretly monitored the family through second-hand observation and developed a wholly false series of accusations about people she had no proper involvement with.

**1.**    ***From Day One, Dr. Wiester Suspected Medical Child Abuse and Formed a False Narrative Using SCAN Surveillance to Support her Suspicion***

91.      Shortly after this initial care coordination meeting in early 2019, a medical resident in training, Taylor Huntington, reported a concern about C.H. (the substance of which is unknown to the Hartmans) regarding medical child abuse to SCH's SCAN team, which is led by Dr. Wiester. SCAN receives referrals of suspected child abuse or neglect and investigates those reports to determine whether intervention via DCYF is required. This initial report was the catalyst for a years-long witch-hunt, led by Dr. Wiester, to find medical child abuse where there was no evidence of abuse. Notable, it was not actionable when made on April 10, 2019, but triggered hostile and malign intrusion by secret surveillance.

92.      After this reported concern in April 2019, SCH's SCAN team began surveilling C.H. This just after C.H. had undergone her second multi-day evaluation at Duke University where her AHC diagnosis was reaffirmed.

93.      As Dr. Wiester later reported to DYCF, "[c]onsultation was requested of the Safe Child and Adolescence Network (SCAN) in early 2019 by a group of C.H.'s SCH specialists and

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

providers at Seattle Children's Hospital because of concern regarding a pattern of parental requests for increasingly invasive procedures based on undocumented signs and symptoms reported by the parent."  This was a false statement by Dr. Wiester.  The consultation was not requested by "a group of C.H.'s SCH specialists and providers at Seattle Children's Hospital" but rather by a resident, a physician in training, who had limited interactions with C.H. and Sophie and, on information and belief, was already working from a "narrative" contrived by the SCAN team, which was so eager for child abuse cases that it made one up.

94.     The SCAN surveillance process was a "deeply flawed" process that lacked any clear set of criteria for evaluating C.H., a clear plan for monitoring her, or any serious investigation or collaboration with C.H.'s healthcare providers for expert analysis of data that SCAN collected.

95.     In fact, the SCAN surveillance of C.H. was initiated by Dr. Wiester, who (at the time) had not spoken with C.H. or her mother, Sophie (and has never), about any such concerns. Dr. Wiester initiated this surveillance of C.H. without consulting any of the AHC specialists at Duke University, – those best able to provide medical recommendations for managing C.H.'s AHC symptoms.

96.     SCAN's surreptitious surveillance went on for approximately two years and was intentionally hidden from Sophie.  Sophie had never failed to comply with a single medical recommendation from SCH providers.  During that time, SCAN's records were generated in a secret "SCAN file" that was not part of C.H.'s medical records.  SCAN members instructed C.H.'s SCH providers not to reference their involvement with SCAN in any of C.H.'s medical records that were available to the Hartmans, to prevent the family from knowing they were being surveilled and set up.  These secret records were concealed from the Hartmans until after being subpoenaed well into the dependency action in 2021.

COMPLAINT - 21

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

97.     Following an initial SCAN team meeting on April 15, 2019, Dr. Wiester stated "[w]e must have consensus about this case," "[i]t does not sound as if we are there yet," and "[a] lot of choreography before showtime."  The "there" that had not been reached yet was the launch of the child abuse case.  This was foreordained, and though the evidence was lacking, this did not stop Dr. Wiester and the abuse narrative leading to "showtime."  The "showtime" was their preconceived, dramatic false accusations.

98.     By May 27, 2019, Dr. Wiester had drafted a letter to DCYF claiming child abuse of C.H.  That letter was not actually sent to DCYF until *21 months later*, in February 2021.  The putting of conclusions before facts – an accusation written years before any basis – is a pattern of misconduct akin to Lavrentiy Pavlovich Beria, Chief of the Soviet Secret Police under Joseph Stalin, saying, "Show me the man, and I'll show you the crime."[4]

### 2. *Dr. Wiester Ignores Objective Medical Evidence Establishing that No Abuse Was Taking Place*

99.     Meanwhile, in 2019 C.H. returned to Duke University for a multi-day evaluation with multiple specialists.  Again, Duke University clinicians observed varying symptoms during C.H.'s different AHC episodes.  For example, Dr. Mikati documented that the neurodevelopment physician observed C.H.'s bilateral dystonia and speech problems.  One Duke University neuropsychologist documented that C.H. had regressed as compared to the prior year.  These symptoms were all documented and available to SCH.  In fact, Sophie had provided C.H.'s Duke University medical records to SCH and directly informed SCH providers of the observations by Duke University specialists.  Dr. Wiester seemingly ignored this information by taking actions that failed to account for what Duke University specialists were documenting.

---

[4] Each member of the SCAN team had an immediate duty to report actual child abuse.  The writing of a letter referring child abuse allegations, had they been real, would have been required to be sent immediately.  The withholding of the letter shows there was known to be no present basis for those 21 months.  But the pre-writing of it shows the indictment was set, but the details were unknown, showing bias, malice, and intention to get to the pre-planned "showtime."

COMPLAINT - 22

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

100.    In spring 2019, C.H. suffered from dehydration, which Sophie informed Dr. Ambartsumyan of through C.H.'s patient portal.  Dr. Ambartsumyan responded curtly and then apologized, writing "I trust your judgment and your care of C.H.  I know that in no way would you ever suggest a practice or an intervention that would not be safe and I apologize if you perceived my recommendations that way, however, that was not my intention."   She actually did not trust Sophie's judgment but misled Sophie to believe that she was abiding parental decisions.

101.    In June 2019, at C.H.'s next appointment with Dr. Ambartsumyan, it was noted that C.H. had been doing well since the placement of the cecostomy tube.

### 3. *C.H.'s AHC Symptoms Are Observed by SCH, then Ignored*

102.    Choosing to ignore what Mary Bridge and Duke University physicians had documented about C.H., Dr. Wiester pushed in July 2019 for an inpatient observation of C.H. under Dr. Wiester's speculative purpose to help build a child abuse narrative that Dr. Wiester had been working on as a precursor to "showtime."  During this investigative work that was falsely presented as advancing care for the AHC diagnosis, Dr. Wiester was interfering with actually providing proper medical care to C.H.  Instead of disclosing her secret inquisition, Dr. Wiester misled the family to further her true purpose: confirming her own suspicion that Sophie had fabricated C.H.'s symptoms.

103.    Dararat Mingbunjerdsuk, M.D., a pediatric neurologist at SCH, arranged for the inpatient observation of C.H. at Dr. Wiester's request.  Sophie agreed because she was misled that a longer observation due to the variability of AHC symptoms was necessary.

104.    At Sophie's urging, Nurse Chase created a log that the nurses used to document C.H.'s symptoms.  Sophie believed at the time that Nurse Chase was a good-faith medical care provider for C.H. and was assisting with C.H.'s medical care.  But unbeknownst to Sophie, Nurse

COMPLAINT - 23

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1   Chase continued to feed information, including this nurse log, to Dr. Wiester to support Dr.

2   Wiester's predetermined case of child abuse.

3       105.    During this inpatient stay, Dr. Mingbunjerdsuk observed an episode of C.H.'s

4   AHC's symptoms. This episode was documented in the system Sophie encouraged SCH to use.

5   Those notes reflect various AHC symptoms, including (among other symptoms) that C.H.

6   experienced hours where she could not speak, appeared unaware of her environment, could not

7   support her weight or walk, and mumbled. Dr. Brei also witnessed C.H.'s episodes and made

8   note of it in his medical records on July 18, 2019.

9       106.    This episode was kept from any of the Duke University multi-disciplinary AHC

10   team members who were working with C.H. to devise care for her AHC. Had the secret records,

11   which were patient records, not been concealed, those AHC experts may have been able to refute

12   the wild inquisition that SCH and its agents were engaged in. Instead, this episode was kept

13   secret and was discussed internally among SCH providers, but only as to how it fit with their

14   preferred diagnosis – child abuse. In an e-mail discussing what Dr. Brei had witnessed, he wrote,

15   "I'm sorry that this complicates things" and "I tried to document in as objective a way as I could

16   think of." The evidence did not fit the child abuse theory that various individuals at SCH had

17   been working on. Instead, SCH and the SCAN team and its collaborators continued to refuse

18   proper AHC care to C.H., which undermined C.H. and the Hartman family.

19       107.    Following the observation of these episodes by Drs. Mingbunjerdsuk and Brei,

20   the SCAN team had a meeting coordinated by Nurse Chase and Dr. Mingbunjerdsuk on July 30,

21   2019. That meeting was attended by Dr. Mingbunjerdsuk, who, according to records, was

22   described as being "pretty upset" given C.H.'s objectively clear AHC episode.

23       108.    At this meeting, the SCAN team emphasized again that C.H. was likely the victim

24   of medical child abuse, despite objective evidence to the contrary. Instead of providing actual

25   medical care, the SCAN team planned to "Enter into a behavioral contract with mother and report

COMPLAINT - 24

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

her to [DCYF] if she does not comply."  Essentially, SCH chose to dismiss C.H.'s symptoms, which were clearly AHC symptoms, instead electing a dramatic narrative of child abuse.

109.    The so-called "behavioral contract" was never communicated or provided to Sophie.  As such, she never had an opportunity to comply, even though she had complied with all SCH medical recommendations that *were* communicated to her.  There was no medical basis for such a "contract," or the ignoring of an expert AHC diagnosis.

### 4. *Dr. Wiester Attempts to Garner Support for a DCYF Referral, and Urges the Removal of the AHC Diagnosis*

110.    The SCAN team, including Dr. Wiester, urged Dr. Mingbunjerdsuk to <u>remove</u> the AHC diagnosis from C.H.'s medical records, despite the fact that Dr. Mingbunjerdsuk was not willing to do so.   Effectively, the SCAN team actually sought to remove a medical diagnosis and information to fit its false narrative, that it was waiting for "showtime" on.   Dr. Mingbunjerdsuk did not believe that Dr. Mikati's AHC diagnosis, as an expert, could be ignored.

111.    The SCAN team then *insisted* that Dr. Mingbunjerdsuk cease prescribing medications for AHC.  Dr. Mingbunjerdsuk refused.

112.    An e-mail from Dr. Mingbunjerdsuk dated August 1, 2019, read: "From Neurology Team, we do not have neurologic indication for [DYCF] to be involved."

113.    An e-mail from Dr. Wiester to Dr. Mingbunjerdsuk on August 2, 2019, read "[t]his child is being harmed and impaired by treatment of undocumented symptoms and a perception of illness and disability unsupported by objective findings."  Those objective findings were present, and Dr. Wiester and the SCAN team had sought to suppress them.

114.    The SCAN team continued to pressure Dr. Mingbunjerdsuk to remove the AHC diagnosis.  Dr. Mingbunjerdsuk ultimately stopped acting as C.H.'s neurologist in October 2019.  C.H.'s neurology care was then taken over by Mark S. Wainwright, M.D., Ph.D., the chief pediatric neurologist at SCH.

COMPLAINT - 25

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

115.     In late 2019, Dr. Wiester created C.H.'s care plan, despite not being C.H.'s physician, not having met or sought consent from the family, not being a gastrointestinal specialist, and not having ever evaluated C.H.  That care plan indicated that C.H. should undergo the removal of the G-Tube.

116.     Dr. Ambartsumyan agreed (without any informed consent by the family) to Dr. Wiester's plan, including increasing oral feeds.  But Dr. Ambartsumyan failed to follow through with instructing Sophie to increase oral feeds or stop using the G-Tube.   Records show that Sophie was instructed by Dr. Ambartsumyan to *continue* C.H.'s tube feeding regimen at each subsequent appointment.  In other words, Sophie was never asked to change C.H.'s care, increase oral feeds with the goal of weaning off G-Tube feeds, or otherwise instructed to stop using the G-Tube.  But Sophie was then set up to be viewed as having *refused* to do so.

117.     In November 2019, Dr. Ambartsumyan was on maternity leave. Ghassan Wahbeh, M.D., the Director of the Inflammatory Bowel Disease Center at SCH, evaluated C.H. during Dr. Ambartsumyan's absence.

118.     In November 2019, Dr. Wahbeh recommended that C.H.'s G-Tube be converted to a G-J Tube, which Dr. Ambartsumyan had previously indicated may be beneficial to C.H.

119.     In March 2020, C.H. attended a third multi-day, multi-disciplinary evaluation at Duke University.  C.H.'s AHC diagnosis was once again reaffirmed.  C.H.'s diagnosis was later reaffirmed, for a fourth time, by Duke University in 2021.  No qualified medical specialist, at any time, challenged that diagnosis, except for the lurid accusation of the SCAN team that Sophie was somehow manipulating all of these experts.

120.     During this third evaluation in March 2020 at Duke University, C.H. underwent a 15-minute non-surgical conversion of the G-Tube to a G-J Tube, based on both the recommendation from Dr. Wabeh at SCH and in consultation with the gastrointestinal specialist at Duke University.  As she had always done, Sophie followed the recommendation of C.H.'s

COMPLAINT - 26

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

medical providers. She of course assumed that they had C.H.'s best interest at heart, and were operating with the family's informed consent in an honest and trustworthy manner (unaware of the SCAN team's interference with that real medical care).

**5.** ***C.H. Suffers from Precocious Puberty, Worsening her AHC Symptoms. While Obtaining Care for these Worsening Symptoms, Dr. Wiester and the SCAN Team Ramp up their Efforts to Make a False Case of Medical Child Abuse***

121. In the summer of 2020, C.H.'s AHC symptoms worsened, in part due to the stress of being in school remotely due to COVID-19. In the summer of 2020, Sophie also noticed signs of precocious puberty in C.H., who had just turned six years old. Sophie reported what she observed to Dr. Wainwright.

122. Dr. Wainwright referred C.H. to Helen L. Dichek, M.D., an endocrinologist. Dr. Dichek confirmed that C.H. was likely in early puberty.

123. Dr. Dichek recommended that C.H. undergo testing and consider treatment options for precocious puberty. Dr. Dichek informed Sophie that treatment could be delivered via regular, monthly injections or a more long-term implant that would provide hormone-suppressant medication. Dr. Dichek informed Sophie that *either* option was appropriate. Sophie preferred an implant to regular injections of hormone suppression medication, which were the two options discussed with her, because the implant would subject C.H. to less pain than regular injections by needle. In addition, having to go to the hospital for monthly appointments for the injections would be disruptive to C.H.'s schedule, including her school schedule, and would be difficult for Sophie, as a single mother, given C.H.'s extensive specialist appointments and therapy sessions.

124. During this time, Dr. Wiester and the SCAN team continued surreptitiously monitoring C.H.'s care. Dr. Wiester e-mailed and called Dr. Dichek and told her that the implant option for hormonal therapy was a concern to Dr. Wiester (although Dr. Wiester is not an

COMPLAINT - 27

7865882.1

endocrinologist, and this therapy had been recommended as a choice to Sophie by an SCH colleague who is an endocrinologist).  Dr. Wiester continued with her preconceived abuse narrative and continued planning to refer Sophie to DCYF.

125.    Dr. Dichek did not believe a DCYF referral was warranted based on her observations of C.H., and refused Dr. Wiester's later request to endorse Dr. Wiester's letter to DCYF.  But this did not stop Dr. Wiester, who continued to argue against and undermine care for AHC because of her false narrative, albeit secretly and without ever meeting the child or mother.

126.    C.H.'s  AHC  symptoms  continued  to  worsen,  despite  following  the recommendations of the medical staff at SCH.  Those recommendations were affected by the SCAN team's interference and "friendly fire."  This led to C.H. being hospitalized in late October 2020.

127.    John J. Alexander, M.D., was the attending neurologist for the inpatient stay.  His notes reflect that he believed that C.H. did suffer from AHC, and that her symptoms were likely worsened by precocious puberty, such that treatment for precocious puberty was necessary.  Sara A. DiVall, M.D., the on-call endocrinologist, completed the referral for a histrelin implant, an implant that provides the release of a natural hormone to treat precocious puberty.

128.    Dr. Wiester continued to monitor these communications and expressed her concern, again without expertise or subject-matter knowledge, that C.H. was recommended for the implant that Dr. Dichek, the consented-to care provider, had recommended to Sophie.

129.    Suddenly, on the last day of C.H.'s hospitalization, Dr. Dichek changed C.H.'s care from hormone therapy for precocious puberty, as was recommended by several SCH physicians, to "watchful waiting."  Upon information and belief, Dr. Wiester directed this change, again without any informed consent, request for informed consent, or expertise.

COMPLAINT - 28

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

130.     This change to C.H.'s care was not communicated to Sophie until 25 days later, with no explanation as to why the plan had changed.  Sophie had signed paperwork for C.H. to receive the implant for hormone suppression medication and expected C.H. would be treated for precocious puberty as recommended by her doctors.  When Sophie asked about the implant, she was told the injections would be given, but was never informed when.  They were not, and she was given vague or false answers like that the injections were backordered.

131.     Sophie became concerned and reported those concerns to Drs. Dichek and Wainwright, the latter of whom requested a referral to another endocrinologist.  No one ever followed up with Sophie about the referral.  Sophie also submitted complaints about Dr. DiVall (and later about Dr. Dichek).  The complaint against Dr. DiVall was related to a pubic exam she performed on C.H. without consent.  The exam was also performed without wearing gloves.  The complaint against Dr. Dichek concerning Dr. Dichek's lack of communication about C.H.'s treatment plan and abrasive interaction with C.H. and Sophie during an outpatient visit.  There was no follow-up by SCH regarding those complaints.

132.     Dr. Dichek informed Dr. Wiester about the complaint that Sophie had made against her.  Dr. Dichek later testified in the attempt to remove C.H. from her family that "[she] did not intend for her request for moral support [from Dr. Wiester] to result in a [DCYF] referral."  This was referencing "moral support" for an unwelcome "child abuse medicine" practitioner whom the family had no knowledge about.  Dr. Dichek admitted that it was reasonable for Sophie to be confused and concerned given the ongoing changes in C.H.'s care plan with no communication with Sophie to keep her informed of these changes.

COMPLAINT - 29

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

### 6. *C.H.'s Symptoms Improve, but Dr. Wiester Presses forward and Reports Sophie to DCYF*

133.     By July 2020, C.H.'s precocious puberty appeared to have slowed.  Precocious puberty can commonly start and stop as a child ages.  This contributed to a lessening of C.H.'s AHC symptoms.

134.     Meanwhile, Dr. Wiester continued pursuing the SCAN surveillance based on her fixed idea of ongoing medical child abuse.  Other doctors continued to disagree.  Dr. Wainwright, for example, stated that he did not believe that a case of medical child abuse was "clear at all."

135.     Dr. Wiester pressed forward with her narrative, against all objective evidence, that C.H. was the victim of medical child abuse.  In December 2020, she wrote, "If [Sophie] does not [agree with our plan], escalation to [DCYF] would be warranted."  This plan was never even communicated with Sophie, and so once again Sophie never had the opportunity to comply with Dr. Wiester's plan.  That plan was falsely premised on a non-expert's speculative accusations in any event.

136.     In January 2021, C.H. saw Dr. Ambartsumyan for the first time since Dr. Ambartsumyan had gone on maternity leave in 2019.  Sophie informed Dr. Ambartsumyan that C.H.'s symptoms were improving.  During that appointment, Dr. Ambartsumyan did not recommend any changes to C.H.'s care, nor did she instruct Sophie to stop using the G-J Tube or indicate she thought the use of the G-J Tube was inappropriate.

137.     C.H. also saw Dr. Wainwright, who indicated that he would discuss with Dr. Mikati whether weaning off some of the neurological medications was appropriate.  Dr. Wainwright documented that Sophie was receptive to the possibility of weaning off the seizure medication, but she was concerned about reducing the medication for dystonia, given that it had been helpful.  Sophie asked that the team at SCH confer with Dr. Mikati prior to making any

COMPLAINT - 30

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

changes to C.H.'s medications, since Dr. Mikati had AHC expertise, which the SCH providers did not.  Dr. Wainwright never conferred with Sophie and never coordinated with Dr. Mikati.

138.    There was an apparent improvement in C.H.'s medical condition.    Dr. Wainwright confirmed that Sophie was agreeing to wean off medications and medical therapy as was recommended.  But suddenly, on February 18, 2021 (nearly two years after first indicating that medical child abuse was suspected), Dr. Wiester directed one of her SCAN social workers to make a referral to DCYF citing medical child abuse.  As part of that referral, Drs. Wiester, Brei, Ambartsumyan, Wainwright, and Nurse Chase told DCYF that they had – as experts – found child abuse.

139.    That letter, endorsed by Drs. Wiester, Brei, Ambartsumyan, Wainwright, and Nurse Chase, misrepresented and ignored C.H.'s medical records.  It also included a number of false statements, and other misleading indications, for example:

    i.    Dr. Wiester stated that "[t]he cause for [C.H.'s symptoms] was not determined." But it *was* determined to be AHC, by actual experts, as reflected extensively in C.H.'s medical record.

    ii.    Dr. Wiester stated that the reason for the G-Tube and cecostomy tube were unknown. This was false. Dr. Wiester knew, as it was clear from C.H.'s records, the reason for these medical interventions.  In fact, the cecostomy tube had been recommended by Dr. Ambartsumyan herself, even though she still signed the letter.

    iii.    Dr. Wiester indicated that Sophie had failed to follow the recommendations and directives of SCH.  But Sophie was never made aware of any of the recommendations that she was accused of failing to follow until after C.H.'s removal by DCYF, and Sophie had complied with all of the medical recommendations that she had been made aware of.

    iv.    Dr. Wiester wrote that Sophie had made false reports about C.H.'s chronic vomiting, which were untrue based on the medical records that reflected observed instances of vomiting by Mary Bridge staff and by SCH staff.

    v.    Dr. Wiester also left in the letter other statements that were known by Dr. Wiester to be false and that was told to her by Dr. Brei to be false (although Dr. Brei still

COMPLAINT - 31

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

endorsed the letter which included allegations that Dr. Brei had alerted Dr. Wiester needed correction).

vi. It falsely stated that consultation was requested by the SCAN team in 2019. In fact, the referral had come from Taylor Huntington, a resident in training.

vii. Dr. Wiester indicated that "[t]here was reportedly one 'episode' witnessed by Dr. Brei of the neurodevelopmental department. It was unclear to Dr. Brei if this was indeed a behavioral event." It was not "unclear" what the reason for the episode was, it had been well-documented documented as an AHC episode. Dr. Wiester knew that claiming the reason for the episode was "unclear" was misleading and was even told this by Dr. Brei, a neurodevelopmental specialist on C.H.'s care team.

viii. Dr. Wiester stated that Dr. Brei had "[r]ecommended in the past (as has the team at Duke University) behavioral evaluation and treatment for C.H. This has not been obtained at this point." But, as Dr. Brei later admitted, it is up to a parent to decide the appropriate behavioral therapy for a child, and not following a recommendation for such therapy is often the case and not a basis to report a parent to DCYF. In any event, the supposed refusal never happened.

ix. Dr. Wiester indicated that C.H. had undergone three swallow studies that were all found to be normal, but her medical records make clear she had only undergone one in November 2016, and that it yielded an abnormal result.

x. Dr. Wiester and the other authors never corrected these misstatements, despite being shown false in sworn testimony.

xi. The overall impression of the letter was that Sophie was a rogue actor, creating improper treatments, which were falsely portrayed as unmoored from medical advice. The suppression of the actual expert diagnosis, the actual medical and evidence-based care decisions, and the meddling and secret interference of the SCAN team, were omitted. This created a highly misleading impression.

140. Notably absent from Dr. Wiester's letter were the results of C.H.'s EEGs; the fact that AHC episodes had been observed by SCH, including by Drs. Brei and Mingbunjerdsuk; the AHC diagnosis-supporting observations and evaluations by Dr. Mikati's expertise that SCH had; the AHC diagnosis-supporting observations by Dr. Al-Mateen that were reflected in the medical records that SCH had; the contents of the nurse's notes from the 2019 hospitalization reflecting

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

C.H.'s AHC symptoms that had been observed by SCH; the contents of C.H.'s extensive medical record reflecting AHC symptoms observed by numerous other physicians, including SCH physicians; and extensive material facts to actually tell the truth about C.H.'s actual diagnosis and needs and Sophie's devotion and diligence.   Essentially, Dr. Wiester cherry-picked information from C.H.'s records that supported her false claim of medical child abuse, drafted the referral letter with the fabricated allegations and claims, and pressured her colleagues to co-sign the uncorrected referral letter.   She did this even though these colleagues had alerted Dr. Wiester previously of the need for corrections.

### 7.   *DCYF Removes C.H. and M.H. from their Mother's Custody without any Proper Investigation or Basis for Removal*

141.   On March 17, 2021, a month after DCYF received the referral from Dr. Wiester, C.H. and M.H. were removed from Sophie's custody by Detective O'Rourke of the City of Renton Police Department.

142.   Upon the removal, Detective O'Rourke used the removal and warrant to search Sophie's home (which was largely copied-and-pasted from Dr. Wiester's misleading referral to DCYF) to search Sophie's home for supposed evidence of assault and child abuse.   This raid of the Hartman home was performed without notice.

143.   During that raid, the CRPD and Detective O'Rourke searched and seized several boxes of Sophie's private and highly-confidential prayer journals, which were in boxes in Sophie's garage.   These prayer journals contained Sophie's most private thoughts and were never intended to be seen by anyone else, let alone publicized openly in court and used by the media. DCYF used cherry-picked portions from the hundreds of pages of prayer journals in court to attempt to show that Sophie was an unfit mother.   DCYF had to resort to those pages because

COMPLAINT - 33

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

the medical records failed to show the contrived story of abuse created by Dr. Wiester and continued by DCYF and its agents.

144.    This surprise raid was maximally dramatized with police wearing tactical gear to create the impression of expected violence by Sophie in an effort to embarrass and harm to harm the Hartman family and humiliate Sophie.

145.    No emergency existed and there was no imminent risk of harm to either C.H. or M.H. at the time of their removal from Sophie's custody.  In fact, shortly before the removal, Sophie had reported to Dr. Ambartsumyan that C.H. was doing well.  Even worse, there were no allegations of medical child abuse or abuse of any form related to M.H., yet she was still removed as well.

146.    After C.H.'s and M.H.'s removal from their mother's custody, Dr. Wainwright reversed his support for the true and expert AHC diagnosis.  When asked why he reversed his support for the AHC diagnosis, which had been confirmed and then serially reaffirmed by world-renowned experts in AHC at Duke University.  Dr. Wainwright stated he had done so after speaking with Detective O'Rourke.  Detective O'Rourke has no medical expertise and no knowledge of AHC.  Dr. Wainwright could not recall what Detective O'Rourke had told him that would change his support for the AHC diagnosis, but he did so.

147.    At the time of the removal, DCYF had made no prior effort to mitigate any supposed threat.  In fact, DCYF had never been in touch with Sophie until the maximally traumatic removal.

148.    Ms. Owens made no referrals and offered no services to remedy any perceived threat or to enable Sophie to comply with such referrals, services, or recommendations.  She did

COMPLAINT - 34

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

nothing to try to mitigate any supposed threat to C.H. and M.H. before proceeding to remove them from Sophie's custody, in contravention of DCYF's own policies.  Ms. Owens later admitted this under oath.

149.    Ms. Owens informed Sophie that she was entitled to updates about C.H. every 24 hours.  But those updates were untimely and seldom provided, and she was not provided with documentation of, or the opportunity to provide informed consent to, the medical care that C.H. was being subjected to at SCH's direction after the removal.  This occurred even when Sophie had lawful parental medical decision-making authority over C.H.

150.    Ms. Owens prepared and filed the dependency petition relying largely (in a near copy-and-paste-fashion) on the report from Dr. Wiester to DCYF and information provided by law enforcement (itself a copy-and-paste from the SCAN team).  Ms. Owens failed to complete any independent investigation.  She only "briefly" reviewed five volumes of records from SCH. After that, she assumed that the statements in Dr. Wiester's letter were true, despite not having any medical training, not talking to Sophie, and not talking to the actual medical experts.  Her only other "investigation" involved speaking to Dr. Wiester, Detective O'Rourke, and a social worker at Duke University, who was unaware of why Ms. Owens was calling and could not provide any useful information.  This was a perfunctory pretend-investigation, totally non-compliant with policies, due care, or common sense.

151.    Ms. Owens also contacted Little Bit Therapeutic Riding Center.  Despite not asking any questions about C.H.'s therapy, she told the therapists there that C.H. would not be allowed to continue with her occupational therapy because SCH deemed it unnecessary (Sophie was still in charge of these decisions).  She also removed C.H.'s custom orthotics from the family

COMPLAINT - 35

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

home, at the direction of the SCAN team, which directed that they not be used.  These actual therapeutic devices were portrayed as Sophie's props to use C.H. for dramatic attention.

### 8.   *C.H. Is Forced into an Isolated Hospitalization at the Direction of the SCAN Team*

152.     After C.H.'s removal, she was involuntarily forced into a 16-day hospitalization in isolation from her family.  That hospitalization resulted in C.H. being left alone for long periods of time, during which she was observed by SCH staff.  No effort was made to place C.H. with her family, including her grandmother or aunt (who immediately flew in from out of state to care for C.H. and M.H.), and who were able to care for C.H. and M.H..  Sophie was disallowed to visit with M.H. for 17 days after the removal, causing enormous emotional distress to the whole family.

153.     The supposed purpose of C.H.'s hospitalization (to observe C.H.'s symptoms) was frustrated because no monitoring plan was put in place.  Sophie had previously provided SCH providers with a method for documenting C.H.'s AHC episodes, and SCH had devised a chart that was embedded within C.H.'s medical record to track AHC symptoms, which SCH failed to implement during this 16-day forced hospitalization.  In fact, Nurse Chase inquired whether it should be assumed no symptoms would be observed, which appears to have been SCH's plan all along – to reveal that Sophie was causing C.H's symptoms, which SCH supposedly anticipated would disappear when the family was separated.  Upon information and belief, this failure to document symptoms was deliberate, to support Dr. Wiester's false claim that the AHC symptoms were being falsified by Sophie.

154.     No visits were permitted with C.H., including by her family, during the 16-day hospitalization.  The hospitalization was a subterfuge to maintain the isolation of C.H. from her

COMPLAINT - 36

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

family for the duration of the forced hospitalization.  Aside from wrongful family separation, C.H. was blocked from proper medical care because of the SCAN team's misguided stratagem – itself child abuse.

155.    On discharge, resident physician in training Angad Kuchar, M.D., noted that "C.H. is a normal 6-year-old child who just needs love."  This suggested that the real pathology was Sophie – she just needed love, not a malign operator like her manipulative, criminal mother. This was a reflection of Dr. Wiester and the SCAN team's witch-hunt ideation, which they continued even after they saw that C.H.'s AHC symptoms had not been stopped by separating the family.

### 9.  *The Dependency Action, Criminal Charges against Sophie, and Resulting Harm to the Hartman Family*

156.    After the 16-day hospitalization and during the dependency action to have a court take C.H. away indefinitely, decision-making authority over C.H.'s care was given to DCYF and C.H.'s grandmother and aunt.  Sophie was only permitted supervised visits with C.H.  SCH also appointed Dr. Nauert (one of the SCAN team members) as C.H.'s PCP and removed Dr. Pavlik, who had been C.H.'s PCP since October 2016, from her care.  SCH and Dr. Nauert then directed C.H.'s care, in coordination with DCYF, excluding Sophie and continuing to deny the AHC diagnosis and refuse proper medical treatment.

157.    Dr. Nauert prevented C.H. from going to her therapies and treatments for AHC, prevented C.H. from using her orthotics, and intentionally ignored C.H.'s severe gastrointestinal symptoms.  Dr. Nauert regularly coordinated C.H.'s care with Dr. Wiester and acted as an agent of DCYF to control C.H.'s medical care.  This was extremely harmful to C.H.

COMPLAINT - 37

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1    158.    During the dependency action, Ms. Maulden, a DYCF worker who had no

2   experience in medical child abuse cases, purported to "investigate" whether a risk of harm

3   existed.  Ms. Maulden listened to the doctors at SCH now fully controlled by the SCAN team

4   and its dogma and relied on Detective O'Rourke to determine that there was

5   "overmedicalization," (or that Sophie was a manipulator per Munchausen Syndrome by Proxy).

6   She took actions that specifically harmed C.H., like opposing Sophie's request for an

7   independent primary care physician other than Dr. Nauert.

8

9    159.    Ms. Whalen, a CASA worker and former DYCF worker, was assigned to be a

10  supposed independent advocate for C.H.  However, she did not independently advocate for C.H.

11  Instead, Ms. Whalen objected to Sophie's requests to permit C.H. to resume therapy and attend

12  her annual evaluations at Duke University despite Ms. Whalen's limited training and skill in

13  medical child abuse cases and failure to inquire about the real AHC diagnosis.  While blocking

14  access to the real experts and denying the real diagnosis, Ms. Whalen concluded that C.H. was

15  being harmed blindly, accepting falsehoods to support that opinion.

16

17   160.    In May 2021, criminal charges were filed against Sophie for two counts of felony

18  assault, one for the hormone suppression implant and one for the cecostomy tube.  Both of these

19  procedures had been recommended by C.H.'s physicians.  As to the cecostomy tube, Dr.

20  Ambartsumyan noted on December 10, 2018, that the "decision has been made to move forward

21  with cecostomy tube placement on 12/27."  As to the hormone suppression implant, Dr. Dichek

22  specifically told Sophie that the hormone suppression implant was appropriate to address C.H.'s

23  signs and symptoms of precious puberty.  The charges were brought by the King County

24  Prosecutor's Office and supported by Detective O'Rourke.  These charges were built upon the

25

COMPLAINT - 38

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

false, misleading, and negligent statements and omissions of DCYF, Ms. Owens, Ms. Maulden, CASA, Ms. Whalen, Dr. Wiester, Dr. Ambartsumyan, Dr. Brei, Dr. Wainwright, and Nurse Chase and their deliberate suppression of the actual medical facts, diagnosis, and recommendations, including SCH's own licensed professionals' recommendations of these very same treatments.

161.    These felony charges led to a media frenzy.  The false information about Sophie in the criminal court documents was repeated along with the misleading and untrue allegations made by DCYF, Ms. Owens, Ms. Maulden, CASA, Ms. Whalen, Detective O'Rourke, the CRPD, Dr. Wiester, Dr. Brei, Dr. Wainwright, Dr. Ambartsumyan, and Nurse Chase in the dependency action.

162.    For example, headlines in the news read that Sophie "CALLOUSLY ABUSED her ADOPTED black child?" and that Sophie had subjected her "adopted daughter to [an] unnecessary feeding tube, wheelchair, [and] hundreds of medical appointments."  Numerous media outlets reported that no one else had observed any symptoms, implying that Sophie had made everything up.  One article read that "these symptoms, including severe seizures, had not been observed by anyone other than [Sophie]."  Dr. Wainwright even falsely reported to the media that during the 16-day hospitalization, there had been "genetic testing, which had not identified a variant in the gene associated with [AHC]."  This is contradicted by C.H.'s medical records and objective testing.

163.    In addition, the media reported that Sophie "went on a PR tour for her sick, adopted African child" and that she, as a "white, Jesus-loving former missionary" who strapped her "little Black girl born in Zambia" into a wheelchair.  It was also reported that "[a]fter adopting

COMPLAINT - 39

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

two siblings from Zambia, Hartman rode a wave of self-generated publicity that started with a book she wrote about her missionary work in that African nation that led to her adoptions." She was painted as not only abusive but also as having made up her child's very real medical symptoms for purposes of publicity and to sell books. These publications were outrageous and greatly humiliating and harmful, especially to Sophie in her career as a writer and to the children, who have been profoundly traumatized and humiliated.

164. This misconduct led to death threats against Sophie and her attorney, forcing Sophie to remain inside a hotel for safety. In total, the Hartman family has spent over $2,850,000 fighting the baseless allegations against them and ill-founded criminal charges brought at the urging of SCH and DCYF. These lies, misleading statements, and omissions were perpetrated by the misconduct of DCYF, Ms. Owens, Detective O'Rourke, the CRPD, Dr. Wiester, Dr. Brei, Dr. Wainwright, Dr. Ambartsumyan, and Nurse Chase. The Hartmans' financial loss during this process included posting a bond of $100,000 to keep Sophie from having to spend extensive time in jail after her arrest for charges of assault. The posting of the bond resulted in the placement of a lien on Sophie's family's home and a payment of significant funds to obtain the bond. To raise funds, the family incurred significant additional costs, including liquidation of retirement assets.

165. The dependency action lasted 14 months.

166. After 14 months of separation and suffering for the Hartman family, it was ultimately made clear that C.H. suffered from AHC. The judge in the dependency action found that SCAN's process was "deeply flawed," after Dr. Wiester's and others' misleading representations were revealed for what they were.

COMPLAINT - 40

167.    The false abuse was painstakingly debunked by a trial of 49 days.  The family presented in court the thoroughly-documented medical evidence including from world-leading physicians in the field of AHC.[5]  It was established that there had been no basis for the removal of C.H. or M.H. in the first place.

168.    Even though the Hartmans had prevailed in the dependency action and trial, SCH succeeded in gaining control of, and continuing, the unwelcome forced medical care of C.H.  SCH did this by using the coercive threat of criminal prosecution on the same fact pattern as the dependency action.  This meddling and unfit medical care continued through December 1, 2023, which was subsequently shortened to November 29, 2023.  The only reason that the Hartmans "agreed" to this was that, after funding their successful defense against the dependency action, they did not have the financial resources to fund a subsequent criminal defense against the unfounded criminal allegations that numerous Defendants used as a backstop to continue their narrative and seek to coerce their continued interference with the family's rights and proper medical care.  In essence, by successfully defending against the dependency action, the Hartman family had been deprived of their financial ability to fight back against the criminal charges, which were based on the same false and misleading statements and misconduct of DCYF, Ms. Owens, Ms. Maulden, Detective O'Rourke, the CRPD, Dr. Wiester, Dr. Brei, Dr. Wainwright, Dr. Ambartsumyan, Nurse Chase, and SCH that had led to the dependency action.

169.    As a result, the Hartmans had no financial means to defend the criminal changes and were forced into entering an "agreement" with the criminal prosecutor, under which SCH

---

[5] During the course of the dependency action, many of C.H.'s therapies and orthotics, which had been prohibited by SCH were reinstated.  This was after another expert assessment at Duke University in October 2021.  DYCF and CASA sought to prevent that expert assessment to preserve their false narrative.

COMPLAINT - 41

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

and Dr. Nauert would have *control* over C.H.'s care until November 29, 2023.  This was overtly in exchange for reducing the criminal charges against Sophie from felonies to a single, non-specific misdemeanor (dismissing the felony charges with prejudice).  After the requirements of that agreement were met, the misdemeanor charge was dropped, and Sophie regained medical decision-making authority over C.H.'s care after November 29, 2023.

170.    After the conclusion of the dependency action, C.H. was still prohibited from using a cecostomy tube, though it was never removed.  This caused C.H. great pain due to the return of her constipation.  It required the use of medications that has led to diarrhea, including at school, causing accidents and humiliation, and an overall lack of social confidence.  C.H.'s suffering due to ongoing gastrointestinal issues has been persistent and debilitating, affecting all aspects of C.H.'s life.

171.    C.H. also continues to suffer from AHC and experiences dystonia, loses her ability to speak at times, and has trouble chewing and swallowing at times.  She experiences weakness and reduced-awareness spells and continues to suffer from major cognitive issues.  She continues to have leg pain, which is sometimes substantial and continues to have fluctuations and inconsistencies, changes in muscle tone, and hemiplegia episodes.  She continues to have dystonic tremors and other consequences due to the lengthy failure to treat her actual medical condition – AHC.

172.    C.H. has experienced great trauma, leading to mood shifts, deep sadness, and has presented with anger, violence, and behavior dysregulation due to the separation, trauma, and her untreated medical condition.

COMPLAINT - 42

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

173.    The actions of SCH, DYCF, and other Defendants have caused the Hartman family enormous pain and suffering, including physical and emotional pain to C.H. and emotional pain to M.H. and Sophie.  They have experienced financial hardship to fund the defense against the dependency action against DCYF's and SCH's use of their vast resources to avoid admitting their own fault.  The Hartman family also suffers from anxiety and constant fear, and C.H. suffers from separation anxiety as a result of being removed from her mother and sister suddenly and for so long.

174.    Sophie has suffered from the acts of Defendants, and has been diagnosed with significant Post Traumatic Stress Disorder, anxiety, and fears of interacting with medical professionals.  Sophie has paid an enormous price to see that C.H. receives the quality care that she deserves as her family heals from the enormous intrusion and harm caused by the Defendants.

175.    Sophie and her children also suffered from stress and harms resulting from the extreme strain that Defendants' acts and omissions placed on their very connected extended family.  That strain has led to Sophie and her children experiencing feelings of humiliation, debt, and sadness for the suffering and tragedy harming others so much.

176.    The daughters' aunt, Samantha Farris, lived in Washington, apart from her husband in Michigan, for 12 months to support Sophie and her nieces and work to undo the harm and false accusations.  Samantha's family was unable to provide care for a beloved foster child whom they had nurtured, when he was placed back into the state system.  Samantha suffered diagnosed Post Traumatic Stress Disorder and was placed on medication.  She was unable to speak with Sophie without other witnesses present, because of additional false claims by Drs. Wiester and Nauert that she was enabling Sophie's supposed contrivance of AHC symptoms and

COMPLAINT - 43

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

diagnoses.  Samantha's family depleted all of their savings to be present to support Plaintiffs.  She was unable to be present in Michigan to support her husband when his beloved grandmother died, she had to drop out of her Ph.D. program, and she had to forego her career and earnings for a year.  Her husband, Kyle, also missed significant work and had his ability to focus and perform in his career impaired.

177.    The daughters' grandparents Art and Anne Hartman lost their retirement savings due to having to lend the money to Sophie to defend her family and avoid incarceration.  Art and Anne were unable to be with Art's father who lived in their Michigan home, when he was dying.  Because Anne needed to be in Washington to prevent the daughters from being placed with strangers, she was unable to attend her beloved father-in-law's funeral.  Their marriage and personal well-being and mental health were placed under great strain, requiring them to seek therapy and counseling to avoid being overtaken by it.

## V.    CAUSES OF ACTION - COUNT I:
### BATTERY (AGAINST SCH AND DRS. WIESTER, WAINWRIGHT, BREI, AMBARTSUMYAN, AND DICHEK, INDIVIDUALLY AND AS AGENTS OF SCH)

178.    C.H. restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

179.    The aforementioned actions of SCH and the medical professionals at SCH, including Drs. Wiester, Wainwright, Brei, Ambartsumyan, and Dichek, constitute battery upon C.H.'s person.

180.    C.H.'s 16-day forced hospitalization in isolation from her family was conducted as a "medical experiment" on C.H. to observe how she would respond as her existing medical therapies were titrated down or removed entirely.  This 16-day hospitalization was intended by

COMPLAINT - 44

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

Drs. Wiester, Wainwright, Brei, Ambartsumyan, and Dichek, had no medical justification, and was without proper disclosure or consent by the patient or her mother.

181.    Even when not physically invasive, the medical care that C.H. received during this hospitalization entailed unwanted touching of C.H.  For example, C.H. underwent unnecessary occupational and physical therapy sessions, and clinical feeding and swallow evaluations.

182.    The forced hospitalization comprised a detention and physical constraint and containment that was unwelcome and nonconsensual.

183.    During this hospitalization, C.H.'s G-J-Tube was replaced with a G-Tube, without consent.  That experience was uncomfortable and distressing to C.H., especially given the fact that she did not have her mother there to comfort her.

184.    The medical care provided during this 16-day hospitalization was provided without consent, and was harmful and offensive to C.H., as was the hospitalization in isolation from her family by itself.

185.    After the seizure and removal of C.H. and M.H., Sophie's medical decision-making authority for C.H. was intact.  Neither Sophie nor C.H. were ever given the opportunity to provide consent (the latter would not have been able to provide effective consent, even if SCH providers had attempted to elicit it from her), or even truthful disclosure, for any medical care during C.H.'s 16-day forced hospitalization and separation from her family and through the conclusion of the dependency action.

186.    This is in stark contrast to the history of C.H.'s medical therapies at SCH up until her seizure and removal, with the prior hospitalizations having been recommended and instituted by SCH staff with consent having been provided on C.H.'s behalf by Sophie.

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

187.    Pursuant to RCW 7.70.030, the injury to C.H. resulted from health care to which C.H. and Sophie did not consent, and resulted from the failure of a health care provider to follow the accepted standard of care, as well as battery *per se*.

188.    Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

189.    At all relevant times hereto, Drs. Wiester, Wainwright, Brei, Ambartsumyan, and Dichek acted as agents of SCH, but also committed these harms acting as individuals.

190.    As a proximate result of the battery committed upon C.H., as identified herein, C.H. seeks damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to C.H.'s mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

## VI.     CAUSES OF ACTION – COUNT II:
### 42 U.S.C. § 1983 VIOLATION OF THE RIGHT TO BE FREE FROM JUDICIAL DECEPTION – FOURTEENTH AMENDMENT
### (AGAINST THE STATE OF WASHINGTON VIA THE DCYF, MS. OWENS, AND MS. MAULDEN, INDIVIDUALLY AND AS AGENTS OF DCYF, CRPD, AND DETECTIVE O'ROURKE, INDIVIDUALLY AND AS AN AGENT OF CRPD)

191.    Plaintiffs C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

192.    Courts have recognized a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases.

193.    Defendants Ms. Owens and Ms. Maulden and Detective O'Rourke removed C.H. and M.H. from Sophie's custody by misrepresentations and omissions.

COMPLAINT - 46

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

194.    M.H. was removed without any actual child abuse or proper basis to conceive a risk of same, other than fabrications and misconduct.    During Detective O'Rourke's investigation, no actual evidence (other than readily discoverable falsehoods) was found of any abuse, neglect, or mistreatment of M.H. by Sophie.

195.    As to C.H., she was removed without any evidence of any actual child abuse or imminent risk of harm.  In fact, the referral to DCYF stated that any supposed risk of harm to C.H., which was described in the referral as "profound" had "decreased" prior to the referral.

196.    There was no imminent risk of harm, which was clear based on the fact that Sophie's medical decision-making authority over M.H. had not been removed (and it was only removed as to C.H. *during* the dependency action), even at the time of the removal of C.H. and M.H. from her custody.

197.    Detective O'Rourke's and Ms. Owens's and Ms. Maulden's statements that there was an imminent risk of harm to C.H. and M.H. were false and misleading, and made with a deliberate or reckless disregard for the truth in order to obtain a court order to remove both children.

198.    Detective O'Rourke later testified that there was no "emergency" at the time of the removal of C.H. and M.H.

199.    The false statements by Detective O'Rourke and Ms. Owens and Ms. Maulden were material to the judicial decision to issue a court order to remove C.H. and M.H. from their home.

200.    At all relevant times hereto, Ms. Owens and Ms. Maulden acted as agents of DCYF, but also committed these harms acting as an individual.

201.    At all relevant times hereto, Detective O'Rourke acted as an agent of CRPD, but also committed these harms acting as an individual.

COMPLAINT - 47

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

202.    Ms. Owens's and Ms. Maulden's and Detective O'Rourke's conduct also represents a violation 42 U.S.C. § 1983, given that their actions were undertaken under color of state law.

203.    As a proximate result of the judicial deception, as identified herein, Plaintiffs seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

### VII.    CAUSES OF ACTION – COUNT III:
### 42 U.S.C. § 1983 VIOLATION OF THE RIGHT AGAINST UNLAWFUL SEARCHES AND SEIZURES – FOURTH AMENDMENT (AGAINST THE STATE OF WASHINGTON VIA THE DCYF, MS. OWENS AND MS. MAULDEN, INDIVIDUALLY AND AS AGENTS OF DCYF, CRPD, AND DETECTIVE O'ROURKE, INDIVIDUALLY AND AS AN AGENT OF CRPD)

204.    C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

205.    A "seizure" occurs when an officer, by physical force or by show of authority, restrains an individual's freedom of movement or when the circumstances surrounding the encounter demonstrate that a reasonable person would not feel free to disregard the officer and go about his or her business.

206.    A seizure without probable cause is *per se* violative of the Fourth Amendment, which is incorporated against each of the States under the Fourteenth Amendment to the United States Constitution.

207.    At the time when C.H. was detained and seized, she had a clearly-established constitutional right under the Fourth and Fourteenth Amendments to the United States

COMPLAINT - 48

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

Constitution to be secure in her person from unreasonable seizure or detention without probable cause.

208.    Any reasonable law enforcement officer knew or should have known of this clearly-established right.

209.    Detective O'Rourke and Ms. Owens and Ms. Maulden were without lawful authority or probable cause to seize C.H. or M.H..  C.H. and M.H. were nevertheless subjected to seizure, with a threat that force, due to the presence of police without prior notice in the early morning at their home, would be used if they did not comply with the command of this apparent authority.

210.    Moreover, the search of Sophie's home was unlawful because the Fourth Amendment requires search warrants to state with reasonable particularity what items are being targeted for search or, alternatively, what criminal activity is suspected of having been perpetrated.  It described the alleged assault (using false and misleading statements and omissions), but did not describe with particularity what would be found at the Hartman's home.

211.    The warrant for the search of Sophie's home violated the Fourth Amendment because it did not describe with particularity the items to be seized or the criminal activity suspected of having been perpetrated.

212.    The conduct by Ms. Owens and Ms. Maulden and Detective O'Rourke was motivated by ill-will, improper motivation, and actual malice.

213.    At all relevant times hereto, Ms. Owens and Ms. Maulden acted as agents of DCYF, but also committed these harms acting as an individual.

214.    At all relevant times hereto, Detective O'Rourke acted as an agent of CRPD, but also committed these harms acting as an individual.

COMPLAINT - 49

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

215.    Ms. Owens's and Ms. Maulden's and Detective O'Rourke's conduct also represents a violation 42 U.S.C. § 1983, given that their actions were undertaken under color of state law.

216.    As a proximate result of the violation of Plaintiffs' Fourth Amendment rights, as identified herein, Plaintiffs seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

## VIII.   CAUSES OF ACTION – COUNT IV:
### 42 U.S.C. § 1983 VIOLATION OF THE RIGHT AGAINST FALSE IMPRISONMENT (AGAINST THE STATE OF WASHINGTON VIA THE DCYF, SCH, AND MS. OWENS AND MS. MAULDEN, INDIVIDUALLY AND AS AGENTS OF DCYF)

217.    C.H. and M.H. restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

218.    A person has a right to be free from unlawful detainment.

219.    C.H. was kept in isolation separated from her family in a hospital for 16 consecutive days.

220.    SCH, the State of Washington through the DCYF, and Ms. Owens and Ms. Maulden were without lawful authority or probable cause to detain C.H.  C.H. was, nevertheless, subjected to detention, with a threat that force would be used if she did not comply with the commands of apparent legal and institutional authority, when formal authority did not exist.

221.    No family visits were allowed during the 16-day hospitalization, presumably to provide sufficient time for the medical experimentation on C.H.  The "forensic evaluation" was a subterfuge to maintain the isolation of C.H. from her family for almost the entire duration of

COMPLAINT - 50

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1   the forced hospitalization as no meaningful evidence regarding the actual medical condition,

2   AHC diagnosis, or the supposed child abuse could be gleaned during this in-hospital interview

3   with C.H.

4       222.    Even when C.H., on numerous occasions, asked to leave, she was not permitted

5   to leave the hospital.

6       223.    A reasonable person would believe that if a state actor has the apparent authority

7   to effect the seizure and removal of a child and her sibling from their home, hospitalize a child

8   and deny family visitation, it implies that force may be used to enforce the denial as well as the

9   16-day isolation.

10       224.    M.H. was kept from her mother and sister without visitation for 17 days following

11   the removal.

12       225.    For 6 of those 17 days, M.H. was placed in foster care with strangers, while her

13   relatives were present and available.  During those 6 days, she was not only kept from her mother

14   and sister, but also from her grandmother and aunt, in total isolation from her family.  This was

15   despite Sophie having parental decision-making authority, which Defendants for this cause of

16   action disregarded and trampled.

17       226.    A reasonable person would believe that if a state actor has the apparent authority

18   to effect the seizure and removal of a child and her sibling from their home, it implies that force

19   may be used to enforce the denial as well as the isolation and placement in foster care.

20       227.    The conduct attributed to SCH, the State of Washington through the DCYF, and

21   Ms. Owens was motivated by ill-will, improper motivation, and actual malice.

22       228.    At all relevant times hereto, Ms. Owens and Ms. Maulden acted as agents of

23   DCYF, but also committed these harms acting as an individual.

24       229.    Ms. Owens's and Ms. Maulden's conduct also represents a violation 42 U.S.C. §

25   1983, given that her actions were undertaken under color of state law.

COMPLAINT - 51

230.     As a proximate result of the false imprisonment of C.H. and M.H., as identified herein, C.H. and M.H. seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to C.H.'s mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

### IX.     CAUSES OF ACTION – COUNT V:
### VIOLATION OF THE RIGHT TO PRIVACY
### (AGAINST SCH AND DR. WIESTER, AND JOHN AND JANE DOES, INDIVIDUALLY AND AS AGENTS OF SCH)

231.     C.H. restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

232.     It is recognized in the State of Washington that there is a privacy right for a patient to access their own medical record.

233.     The Fourth Amendment, made applicable to the State of Washington by the Fourteenth Amendment, has been referred to as creating a "right to privacy." *See Griswold v. Connecticut*, 381 U.S. 479, 484 (1965).

234.     Pursuant to the State of Washington's Uniform Health Care Information Act (UHCIA), RCW 70.02, *et seq.*,  a patient has a right to their own medical care information.

235.     The Health Insurance Portability and Accountability Act (HIPAA) also provides that  patients have a "fundamental right to timely access to their medical records."

236.     In C.H.'s case, SCH's SCAN team utilized a system to maintain a parallel "ghost" medical record separate from C.H.'s legitimate medical record, in which falsehoods were published, and upon which meddlesome interference and improper medical decisions were made.

COMPLAINT - 52

237.   That "ghost" medical record included false and misleading information about Sophie and C.H.'s care, which was used to set up Sophie based on Dr. Wiester's suspicion of medical child abuse.  That information was published to other doctors and staff of SCH and caused a harmful interference with C.H.'s actual medical care.

238.   That information was not provided to C.H. or Sophie, even upon requests for her medical records, and C.H. and Sophie could not have known of their existence.

239.   The information, part of the family's medical records, was concealed from the Duke University AHC experts, who may have been able to prevent the highly misconceived actions and omissions of SCH and its agents, and the resulting harm.

240.   Even in response to a subpoena, SCH denied the existence of these records, until forced to admit the truth.  SCH knew that the medical records belonged to the family, and attempted to hide its improper records, which nevertheless belonged (and belong) to the family.

241.   Only under extensive pressure did SCH's attorney note in an email to Dr. Wiester: "Well, we anticipated this might happen. We do have an obligation to produce the requested emails, calendar entries that are relevant, and any notes from any meetings that exist."  By design, the system was planned to be secret and unknown to the actual owner and exclusive beneficiary of the medical records.

242.   At all relevant times hereto, Dr. Wiester and other John and Jane Does acted as agents of SCH, but also committed these harms acting as individuals.

243.   As a proximate result of the violation of C.H.'s right to privacy, as identified herein, C.H. seeks damages, including for consequent battery, negligence, unawareness of subversion and other misconduct and inability to protect against various Defendants' misconduct and harm; bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to C.H.'s mental

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    and emotional health; litigation expenses, including attorneys' fees and costs to defend the family

2    and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

3                            **X.      CAUSES OF ACTION – COUNT VI:**
     **NEGLIGENT REPORTING OF MEDICAL CHILD ABUSE (AGAINST SCH AND**
4    **DRS. WIESTER, WAINWRIGHT, BREI, AMBARTSUMYAN, AND NURSE CHASE,**
     **AND JOHN AND JANE DOES, INDIVIDUALLY AND AS AGENTS OF SCH)**

5           244.    C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of

6    the allegations set forth in the preceding paragraphs as if fully set forth herein.

7           245.    A report of suspected child abuse must be made "at the first opportunity, but in

8    no case longer than forty-eight hours after there is reasonable cause to believe that the child has

9    suffered abuse or neglect." RCW 26.44.030.

10          246.    A report of child abuse or neglect must be made in good faith.

11          247.    Dr. Wiester claims to have in good faith suspected child abuse on or before May

12   27, 2019, when she composed a draft report to DCYF, much of which remained in the final letter

13   that she sent to DCYF 21 months later, on February 18, 2021.  That suspicion was baseless, other

14   than an evidence-free hunch, that she did not even pretend to have a factual basis for almost two

15   years of improper conduct.

16          248.    The actual report of medical child abuse by Dr. Wiester, and endorsed by Drs.

17   Wainwright, Brei, Ambartsumyan, and Nurse Chase made almost two years later on February

18   18, 2021, with a series of false and misleading statements, was not made in good faith.  Numerous

19   doctors at SCH, including Dr. Mingbunjerdsuk, informed Dr. Wiester that there was insufficient

20   evidence of medical child abuse.  After voicing the concern that DCYF should not be involved,

21   Dr. Mingbunjerdsuk was replaced on C.H.'s care team by Dr. Wainwright.  Dr. Wainwright also

22   indicated that the SCAN allegation of medical child abuse was not "clear at all."

23          249.    At the time that Dr. Wiester and Drs. Wainwright, Brei, Ambartsumyan, and

24   Nurse Chase reported Sophie to DCYF, there was no truthful evidence of abuse, and Sophie, as

25

COMPLAINT - 54

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1    she had at all times, was complying with all SCH medical recommendations.  C.H.'s medical

2    condition at the time was improving, and there was no abuse, assault, or immediate risk of harm

3    to C.H., as Dr. Wiester herself acknowledged in her letter "…the risk to C.H. has decreased with

4    improved medical team collaboration…"

5         250.    The judge in the dependency action ultimately found, after 49 days of trial, that

6    SCAN's process was "deeply flawed," after Dr. Wiester's misleading representations were

7    revealed for what they were in a hugely harmful and costly debunking process.

8         251.    At all relevant times hereto, Drs. Wiester, Wainwright, Brei, Ambartsumyan, and

9    Nurse Chase acted as agents of SCH, but also committed these harms acting as individuals.  On

10   information and belief, other persons, John and Jane Does, contributed to the tortious conduct

11   herein, and Plaintiffs reserve the right to amend to add such individuals.

12        252.    As a proximate result of the negligent report of medical child abuse, as identified

13   herein, Plaintiffs seek damages, including for bodily injury; physical suffering; physical

14   inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and

15   emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty;

16   and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including

17   attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory

18   damages, in an amount to be determined at trial.

19          **XI.    CAUSES OF ACTION – COUNT VII:**
     **NEGLIGENT INVESTIGATION OF MEDICAL CHILD ABUSE (AGAINST THE**
20   **STATE OF WASHINGTON VIA THE DCYF, SCH, MS. OWENS AND MS.**
     **MAULDEN, INDIVIDUALLY AND AS AGENTS OF DCYF, CRPD, AND**
21   **DETECTIVE O'ROURKE, INDIVIDUALLY AND AS AN AGENT OF CRPD)**

22        253.    C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of

23   the allegations set forth in the preceding paragraphs as if fully set forth herein.

24        254.    Pursuant to RCW 26.44.050, "[u]pon the receipt of a report concerning the

25   possible occurrence of abuse or neglect, it shall be the duty of the law enforcement agency or the

COMPLAINT - 55

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

department of social and health services to investigate and provide the protective services section with a report in accordance with the provision of chapter 74.13 RCW, and where necessary to refer such report to the court."

255.    Detective O'Rourke's and Ms. Owens's and Ms. Maulden's lack of diligence and failure to meet their duty resulted in ignoring the truth and gathering incomplete or biased information.

256.    Ms. Owens and Ms. Maulden prepared the dependency petition relying solely on the report from Dr. Wiester to DCYF and information provided by law enforcement, which in turn also lacked any meaningful original source or inquiry, and just parroted what SCH and Dr. Wiester reported.

257.    Ms. Owens testified that she believed the dependency petition allegations to be true based on her *assumption* that what Dr. Wiester reported was accurate and her *assumption* that what law enforcement told her was correct.  She did not engage in any investigation to determine if those allegations were actually true despite having access to the medical records that revealed that many of the claims in Dr. Wiester's letter were demonstrably false.

258.    Detective O'Rourke also simply *assumed* that the report by Dr. Wiester to DCYF to be true, as is evidenced by her copying and pasting of it into the affidavit seeking a warrant for a search of Sophie's home.

259.    There was no assault, child abuse, or imminent threat to either C.H. or M.H. and therefore no need to take either into immediate protective custody.  As to C.H., the allegation of child abuse was false and misleading.  As to M.H., there was no accusation of medical child abuse or other abuse, and therefore no need to remove her from her mother's custody.

260.    Ms. Owens's and Ms. Maulden's and Detective O'Rourke's investigations failed to use ordinary care and were negligent.

COMPLAINT - 56

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

261.    At all relevant times hereto, Ms. Owens and Ms. Maulden acted as agents of DCYF, but also committed these harms acting as an individual.

262.    At all relevant times hereto, Detective O'Rourke acted as an agent of CRPD, but also committed these harms acting as an individual.

263.    As a proximate result of the negligent investigation, as identified herein, Plaintiffs seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

## XII.    CAUSE OF ACTION – COUNT VIII:
### NEGLIGENT PLACEMENT (AGAINST THE STATE OF WASHINGTON VIA THE DCYF AND MS. OWENS, MS. MAULDEN, INDIVIDUALLY AND AS AGENTS OF DCYF, CASA, AND MS. WHALEN, INDIVIDUALLY AND AS AN AGENT OF CASA)

264.    C.H. and M.H. restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

265.    Pursuant to RCW 13.34.060, when a child is removed from her parent's custody, there is a requirement that the child be placed with a relative or other suitable person requested by the parent, unless there is "reasonable cause to believe that the health, safety, or welfare of the child would be jeopardized or that the efforts to reunite the parent and child will be hindered."

266.    DCYF and Ms. Owens and Ms. Maulden, and CASA and Ms. Whalen, failed in their duty to place C.H. and M.H. with relatives or other suitable persons as requested by Sophie.

267.    DCYF and Ms. Owens and Ms. Maulden, and CASA and Ms. Whalen, could have placed C.H. and M.H. with their grandmother, Anne Hartman, who flew in the day that they were removed and could have cared for them that night.  Or C.H. and M.H. could have been

COMPLAINT - 57

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

placed with Samantha Farris, their aunt who flew in from Michigan the next morning after their seizure and removal.  Ms. Farris is a social worker and certified trauma specialist as well as a foster parent in Michigan, so she would have been an extremely qualified and experienced family member for the placement of her two nieces.

268.   Instead, DYCF, Ms. Owens, Ms. Maulden, and CASA and Ms. Whalen disallowed C.H. and M.H. to stay together or even see each other.  They were disallowed to communicate at all for a period of time after their removal from Sophie's custody, and M.H. was placed in a foster home with strangers.

269.   Additionally, Ms. Owens, Ms. Maulden, and Ms. Whalen subsequently also denied Ms. Farris's and Anne Hartman's repeated requests for permission to see or communicate with C.H. during her 16-day forced hospitalization.

270.   Ms. Owens, Ms. Maulden, Ms. Whalen, CASA and DCYF failed to use ordinary care in the placement of C.H. and M.H. and were negligent.

271.   At all relevant times hereto, Ms. Owens and Ms. Maulden acted as agents of DCYF, but also committed these harms acting as individuals.

272.   At all relevant times hereto, Ms. Whalen acted as an agent of CASA, but also committed these harms acting as an individual.

273.   As a proximate result of the negligent placement, as identified herein, C.H. and M.H. seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

COMPLAINT - 58

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1

2

<u>CAUSES OF ACTION – COUNT IX:</u>
<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST ALL</u>
<u>DEFENDANTS)</u>

3

4

274.     C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of
the allegations set forth in the preceding paragraphs as if fully set forth herein.

5

6

7

8

9

275.     Defendants' removal of C.H. and M.H. and forced 16-day hospitalization of C.H.
without consent and in isolation from her family, refusal of contact between Sophie and C.H.,
negligent placement of M.H. in foster case, negligent reporting of medical child abuse, and other
actions and omissions, including engaging in giving C.H. medical treatment without consent,
were intentional acts that caused C.H., M.H., and Sophie severe emotional distress.

10

11

12

13

14

276.     The emotional distress caused is within the scope of foreseeable harm due to the
intentional conduct by Defendants.  As one court noted, "[w]resting a child from even inadequate
parents causes detrimental, long-term, and complex emotional and psychological consequences
worse than leaving the child at home."  *In re Dependency of L.C.S.*, 200 Wn.2d 91, 106, 514
P.3d 644 (2022).

15

16

17

277.     Since C.H. was removed from her home, the Hartmans have observed the
emotional impact on her, such as worsening AHC symptoms and behavioral regression,
including more aggressive behavior.

18

19

20

21

278.     M.H. has also shown signs of emotional distress, including despair, deep sadness,
and behavior regression.  M.H. had her life frozen during an otherwise loving and healthy
childhood, suffering great distraction impeding her education, a halt to her promising
competitive gymnastics endeavor, and constant fear and upset.

22

23

24

25

279.     Given their age and considering the trauma of being forcibly removed from their
home early in the morning with a police presence and with no prior notice and then not being
able to visit each other or other members of their family, C.H. and M.H. reacted reasonably.  As
to Sophie, given that her children were removed from her custody without any prior notice, she

COMPLAINT - 59

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

has been diagnosed with suffering from significant Post Traumatic Stress Disorder, anxiety, and fears of interacting with medical professionals, which is reasonable given the circumstances.

280.    With respect to this claim, all individual Defendants acted individually and also as agents for their respective corporate entities.

281.    As a proximate result of the intentional infliction of emotional distress, as identified herein, Plaintiffs seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

## CAUSES OF ACTION – COUNT X:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST ALL DEFENDANTS)

282.    C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

283.    Defendants acted negligently before and during the removal of C.H. and M.H. and forced 16-day hospitalization of C.H. without consent and in isolation from her family, refusal of contact between Sophie and C.H., placement of M.H. in foster care, reporting of medical child abuse, and other actions and omissions, including engaging in giving C.H. medical treatment without consent, which caused C.H., M.H., and Sophie severe emotional distress.

284.    The emotional distress caused is within the scope of foreseeable harm due to the negligent conduct by Defendants.  As one court noted, "[w]resting a child from even inadequate parents causes detrimental, long-term, and complex emotional and psychological consequences worse than leaving the child at home."  *In re Dependency of L.C.S.*, 200 Wn.2d 91, 106, 514 P.3d 644 (2022).

COMPLAINT - 60

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

285.    Since C.H. was removed from her home, the Hartmans have observed the emotional impact on her, such as worsening AHC symptoms and behavioral regression, including more aggressive behavior.

286.    M.H. has also shown signs of emotional distress, including despair, deep sadness, and behavior regression.  M.H. had her life frozen during an otherwise loving and healthy childhood, suffering great distraction that impeded her education, halted her promising competitive gymnastics pursuit, and caused her constant fear and upset.

287.    Given their age and considering the trauma of being forcibly removed from their home early in the morning with a police presence and with no prior notice and then not being able to visit each other or other members of their family, C.H. and M.H. reacted reasonably.  As to Sophie, given that her children were removed from her custody without any prior notice, she has been diagnosed with suffering from significant Post Traumatic Stress Disorder, anxiety, and fears of interacting with medical professionals, which is reasonable given the circumstances.

288.    With respect to this claim, all individual Defendants acted individually and also as agents for their respective corporate entities.

289.    As a proximate result of the negligent infliction of emotional distress, as identified herein, Plaintiffs seek damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health, litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

COMPLAINT - 61

## CAUSES OF ACTION – COUNT XI:
## MEDICAL MALPRACTICE (AGAINST SCH AND DRS. WIESTER, WAINWRIGHT, BREI, AMBARTSUMYAN, DICHEK, AND NAUERT, INDIVIDUALLY AND AS AGENTS OF SCH)

290.    C.H., M.H., and Sophie restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

291.    SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, Dichek, and Nauert had a duty to care for C.H. consistent with the accepted standard of care pursuant to RCW 7.70.030(1).

292.    SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, Dichek, and Nauert breached this duty, and were negligent, when they ignored C.H.'s medical symptoms, ignored medical records, failed to diagnose C.H.'s AHC, disregarded the expert diagnosis of AHC, and then refused to treat C.H. for AHC.  For example, Dr. Wiester directed Dr. Mingbunjerdsuk *not* to prescribe medications for AHC.

293.    Further, Dr. Wiester committed malpractice by creating C.H.'s care plan despite not being a gastrointestinal specialist, not being C.H.'s care provider, not evaluating C.H., and not speaking to Dr. Ambartsumyan, C.H.'s gastrointestinal physician.  Dr. Ambartsumyan committed malpractice by agreeing to Dr. Wiester's plan to increase oral feeds, and at the same time failing to request that Sophie increase oral feeds to cease using the G-Tube, among other improper disregards of informed-consent based care decided by the family.

294.    SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, Dichek, and Nauert committed malpractice by engaging in enormous and inappropriate medical interventions during C.H.'s 16-day hospital stay without informed consent, including informed consent of Sophie who had legal medical decision-making control over C.H.'s care, in the absence of any emergency, among other improper disregards of expert medical opinion, expert diagnoses, family care decisions, and procedures based on lack of informed consent.

COMPLAINT - 62

295.     The overall SCAN involvement and interference with the family was "deeply flawed" and negligent.  There was never any need nor any informed consent, and the specific and systemic forcing of the family to submit to involuntary "medical care" was malpractice.

296.     The 16-day hospitalization, ostensibly so that C.H. could be observed when separated from her family, was an improper medical experiment driven by Dr. Wiester and others on the SCAN team and their collaborators and was based on improper motives, had no legitimate medical reason, lacked informed consent, and constituted medical malpractice outside the accepted standard of care.

297.     Dr. Wainwright also committed medical malpractice by changing his diagnosis of C.H.'s medical condition from AHC to static encephalopathy without consulting with Dr. Mikati, and based on the supposed direction of someone with no formal medical training, experience, or license – Detective O'Rourke, – whom the family never gave authority to make medical decisions.

298.     SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, Dichek, and Nauert further committed malpractice by failing to coordinate with C.H.'s care providers at Duke University, including Dr. Mikati, an expert in AHC, and by failing to coordinate with C.H.'s PCP or therapy providers.  Dr. Nauert also denied C.H. medical care including therapies and orthotics that C.H. had been prescribed that helped her, including with the ability to walk.

299.     As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, C.H. has received inadequate medical care, received improper medical care, and was removed, without basis, from her family for 492 days.

300.     At all relevant times hereto, Drs. Brei, Wiester, Wainright, Ambartsumyan, Dichek, and Nauert acted as agents of SCH, but also committed these harms acting as individuals.

COMPLAINT - 63

301.     As a proximate result of the medical malpractice, as identified herein, C.H. seeks damages, including for bodily injury; physical suffering; physical inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty; and disgrace and injury to Plaintiffs' mental and emotional health; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

### CAUSES OF ACTION – COUNT XII:
### NEGLIGENT SUPERVISION AND RATIFICATION (AGAINST SCH)

302.     C.H. restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

303.     SCH medical professionals, including Dr. Wiester and other individuals, John and Jane Does until specific details unavailable to Plaintiffs are visible, committed tortious acts as averred in the paragraphs incorporated above.

304.     These actions caused the removal of C.H. and M.H. from their mother's custody, without probable cause, and caused emotional distress and physical harm to C.H. during a forced 16-day hospitalization and during the 492 days during which C.H. was separated from her mother and sister.

305.     SCH had a duty to provide physicians and staff that could provide a competent, appropriate assessment and treatment plan for C.H. and the Hartman family.

306.     SCH had a further duty to supervise C.H.'s treatment and ensure that her care was properly coordinated by the doctors and healthcare providers involved.

307.     SCH had a duty to protect private patient records, abide parental medical decision-making, abide the system of informed consent, and not impose medical decisions or

COMPLAINT - 64

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1   take control of family medical decisions, among other systemic errors, or allow its employees

2   and agents to do the same.

3       308.   SCH breached these duties by failing to supervise its employees and therefore

4   ratified the SCH's doctors' tortious conduct.  It established an internal agency, the SCAN team,

5   that violated informed consent, medical records privacy and integrity, interfered with proper

6   medical care, presumed to make medical decisions instead of the family, and committed

7   extensive misconduct to the detriment of its patients, secretly, without ever meeting the patient

8   and unlawfully.  In not taking corrective action to ensure that C.H. and her family received

9   competent, appropriate treatment and care, SCH ratified the inconsistent and improper actions

10   of its involved doctors and healthcare providers.

11       309.   SCH failed to put in place adequate policies and procedures to train its physicians,

12   healthcare providers, and other employees or agents so that they could properly assess C.H.'s

13   AHC, coordinate C.H.'s care, resist the SCAN team's misconduct, or appropriately interact with

14   the Hartman family.  To the extent that SCH had any policies or procedures in place to prevent

15   these lapses, SCH failed to ensure that its employees and agents complied with its policies and

16   procedures, thus allowing for erroneous, unprofessional, and arbitrary treatment of C.H. and her

17   family by the doctors and staff involved.

18       310.   The above-described failures of SCH to properly train and supervise its

19   physicians, other healthcare providers, and employees and agents involved in C.H.'s "care,"

20   coupled with SCH's ratification of these acts and omissions, proximately caused damage to the

21   Plaintiffs.

22       311.   As a proximate result of the negligent supervision and ratification, as identified

23   herein, C.H. seeks damages, including for bodily injury; physical suffering; physical

24   inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering, and

25   emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty;

COMPLAINT - 65

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1   and disgrace and injury to C.H.'s mental and emotional health; litigation expenses, including

2   attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory

3   damages, in an amount to be determined at trial.

### CAUSE OF ACTION – COUNT XIII:
### 42 U.S.C. § 1983 DEPRIVATION OF SOPHIE'S CONSTITUTIONAL RIGHTS
### (AGAINST THE STATE OF WASHINGTON VIA THE DCYF)

6   312.    Sophie restates, re-alleges, and incorporates by reference each of the allegations

7   set forth in the preceding paragraphs as if fully set forth herein.

8   313.    This claim is brought pursuant to 42 U.S.C. § 1983.

9   314.    The "interest of parents in the care, custody, and control of their children is

10   perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court of the

11   United States. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000).

12   315.    Sophie, as the mother of C.H. and M.H., has a fundamental liberty interest in the

13   care, custody, and management of her children.

14   316.    Sophie's liberty interest was violated when the State of Washington, via its

15   agency, the DCYF, improperly removed her children.

16   317.    Sophie's liberty interest was violated when the State permitted the unlawful

17   hospitalization of C.H. in isolation for 16 days.

18   318.    Sophie's liberty interest was further violated when the State improperly denied

19   her visitation with her children, including C.H., during her forced hospitalization.

20   319.    As a result of the State of Washington's violations of Ms. Hartman's rights,

21   Sophie seeks damages, including for physical suffering; physical inconvenience and discomfort;

22   feelings of helplessness; mental agony; mental suffering and emotional distress from

23   embarrassment, humiliation, and intimidation; and disgrace and injury to Sophie's mental and

24   emotional health; litigation expenses, including attorneys' fees and costs; and other

25   compensatory damages, in an amount to be determined at trial.

COMPLAINT - 66

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

1

**CAUSE OF ACTION – COUNT XIV:**
**42 U.S.C. § 1983 DEPRIVATION OF C.H.'S AND M.H.'S CONSTITUTIONAL**
**RIGHTS (AGAINST THE STATE OF WASHINGTON VIA THE DCYF)**

2

3          320.    C.H. and M.H. restate, re-allege, and incorporate by reference each of the

4    allegations set forth in the preceding paragraphs as if fully set forth herein.

5          321.    This claim is brought pursuant to 42 U.S.C. § 1983.

6          322.    Children "have a substantive due process right to be free from unreasonable risk

7    of harm, including a risk flowing from the lack of basic services, and a right to reasonable safety."

8    *Braam v. State of Washington*, 150 Wn. 2d 689, 699-700, 81 P.3d 851 (2003).

9          323.    C.H. and M.H. have a fundamental liberty interest in living with their mother and

10   not being abused by agents of the State.

11          324.    C.H.'s and M.H.'s fundamental liberty interest was infringed by their improper

12   removal by the State from their mother.

13          325.    As a result of the State of Washington's violations of C.H.'s and M.H.'s rights,

14   C.H. and M.H. seek damages, including for bodily injury; physical suffering; physical

15   inconvenience and discomfort; feelings of helplessness; mental agony; mental suffering and

16   emotional distress from embarrassment, humiliation, and intimidation; deprivation of liberty;

17   and disgrace and injury to C.H.'s and M.H.'s mental and emotional health; litigation expenses,

18   including attorneys' fees and costs to defend the family and Sophie's freedom; and other

19   compensatory damages, in an amount to be determined at trial.

20

**CAUSE OF ACTION – COUNT XV:**
**DEFAMATION (AGAINST THE STATE OF WASHINGTON VIA THE DCYF, MS.**
**OWENS AND MS. MAULDEN, INDIVIDUALLY AND AS AGENTS OF DCYF, CASA,**
**MS. WHALEN, INDIVIDUALLY AND AS AN AGENT OF CASA, CRPD, AND**
**DETECTIVE O'ROURKE, INDIVIDUALLY AND AS AN AGENT OF CRPD)**

21

22

23          326.    Sophie restates, re-alleges, and incorporates by reference each of the allegations

24   set forth in the preceding paragraphs as if fully set forth herein.

25

COMPLAINT - 67

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

327.    The State of Washington, CRPD, Ms. Owens, Ms. Maulden, CASA, Ms. Whalen, and Detective O'Rourke made a series of false claims about Sophie, including false claims that she is a child abuser, abused or neglected her daughter, C.H., and was an unfit mother.

328.    The State of Washington's, CRPD's, Ms. Owens's, Ms. Maulden's, CASA's, Ms. Whalen's, and Detective O'Rourke's statements were and are demonstrably false.  The claims are demonstrably false without reference to specific factual matters and unsupported by evidence, including C.H.'s medical records.

329.    The State of Washington, CRPD, Ms. Owens, Ms. Maulden, CASA, Ms. Whalen, and Detective O'Rourke made or published these statements with knowledge of their falsity or, at the very least, with reckless disregard for their falsity.

330.    The State of Washington, CRPD, Ms. Owens, Ms. Maulden, CASA, Ms. Whalen, and Detective O'Rourke made and published these statements without privilege or justification.

331.    To the extent that the State of Washington, CRPD, Ms. Owens, and Detective O'Rourke may argue that the statements are opinions, the State of Washington, CRPD, Ms. Owens, and Detective O'Rourke failed to disclose any factual support for its statements.

332.    At all relevant times hereto, Ms. Owens and Ms. Maulden acted as agents of DCYF, but also committed these harms acting as individuals.

333.    At all relevant times hereto, Ms. Whalen  acted as an agent of CASA, but also committed these harms acting as an individual.

334.    At all relevant times hereto, Detective O'Rourke acted as an agent of CRPD, but also committed these harms acting as an individual.

335.    These statements have damaged Sophie by causing reputational harm, including in her career as a writer, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and medical harm associated therewith; litigation expenses, including

COMPLAINT - 68

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

## CAUSE OF ACTION – COUNT XVI:
### DEFAMATION (AGAINST SCH AND DRS. WIESTER, WAINWRIGHT, BREI, AMBARTSUMYAN, NURSE CHASE, AND JOHN AND JANE DOES, INDIVIDUALLY AND AS AGENTS OF SCH)

336.    Sophie restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

337.    SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase made a series of false claims about Sophie, including false claims that she is a child abuser, abused and neglected her daughter, C.H., and was an unfit mother.

338.    These statements have been made in the "ghost" medical file used by the SCAN team that was segregated from C.H.'s medical record and hidden from the Hartmans, which was published to other physicians and staff at SCH, and elsewhere.

339.    These statements have also been made in the false and misleading report to DCYF, which report was made with actual malice, as described in paragraphs 139 and 140.  That report was endorsed by Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase, and its content was foreseeably publicized in court proceedings and media reporting.

340.    It was through the publication by Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase of the false allegations of Sophie that led to the dependency action, criminal charges, and media frenzy about Sophie, which reiterated the false claims that she had made up C.H.'s symptoms and was a child abuser.  Sophie's reputation was maligned by this media frenzy.  Their publication of these false statements also led to death threats against Sophie.

341.    SCH's and Drs. Brei's, Wiester's, Wainright's, Ambartsumyan's and Nurse Chase's statements were and are demonstrably false.  The claims were demonstrably false or

COMPLAINT - 69

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7865882.1

misleading by omission of C.H.'s medical records or unsupported by the evidence known to these individuals altogether.

342. SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase made or published these statements with knowledge of their falsity or, at the very least, with reckless disregard for their falsity.

343. SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase made and published these statements without privilege or justification.

344. To the extent that SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase may argue that the statements are opinions, SCH and Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase failed to disclose the factual support for their statements.

345. At all relevant times hereto, Drs. Brei, Wiester, Wainright, Ambartsumyan, and Nurse Chase acted as agents of SCH, but also committed these harms acting as individuals. On information and belief, other persons, John and Jane Does, contributed to the tortious conduct herein, and Plaintiffs reserve the right to amend to add such individuals.

346. These statements have damaged Sophie by causing reputational harm, including in her career as a writer, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and medical harm associated therewith; litigation expenses, including attorneys' fees and costs to defend the family and Sophie's freedom; and other compensatory damages, in an amount to be determined at trial.

### XIII.   JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

### XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

A. Compensatory, consequential, exemplary, loss of consortium, punitive, and multiple damages on all claims so permitted;

COMPLAINT - 70

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    B.        Prejudgment interest;

2    C.        Attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable statute;

3    D.        Compensation for the amount the Hartman family incurred in defending itself in

4                the underlying dependency action, exceeding $2,850,000; and

5    E.        Such other and further relief as the Court deems just and proper.

6    DATED this 15th day of March, 2024.

7

8                               *s/Eliot M. Harris*

                                 Eliot M. Harris, WSBA #36590

9                              **WILLIAMS, KASTNER & GIBBS PLLC**

10                            601 Union Street, Suite 4100

                            Seattle, WA 98101-2380

11                            Tel:    (206) 628-6600

                            Fax:    (206) 628-6611

12                            Email: eharris@williamskastner.com

13                            David J. Shlansky, MA BBO #565321*

                            Frances F. Workman, VT Atty. #6581*

14                            **SHLANSKY LAW GROUP, LLP**

                            1 Winnisimmet Street

15                            Chelsea, MA 02150

16                            Tel:    (617) 492-7200

                            Email: david.shlansky@slglawfirm.com

17                                     frances.workman@slglawfirm.com

18                          (* *pro hac vice* admission forthcoming)

19                          ***Attorneys for Plaintiffs***

20

21

22

23

24

25

COMPLAINT - 71

7865882.1

**KING COUNTY SUPERIOR COURT**

**CASE ASSIGNMENT AREA DESIGNATION and CASE INFORMATION COVER SHEET (CICS)**

Pursuant to King County Code 4A.630.060, a faulty document fee of $15 may be assessed to new case filings missing this sheet.

**CASE NUMBER:** _____

(Provided by the Clerk)

**CASE CAPTION:**  M.H., a minor; C.H., a minor; Sophie Hartman, individually and as a parent of C.H. and M.H. v. State of Washington Department of Children, Youth & Families, et al.

(New case: Print name of person starting case **vs.** name of person or agency you are filing against.)

(When filing into an existing family law case, the case caption remains the same as the original filing.)

Please mark one of the boxes below:

☒     **Seattle Area**, defined as:

> All of King County north of Interstate 90 and including all of the Interstate 90 right-of-way; all the cities of Seattle, Mercer Island, Bellevue, Issaquah and North Bend; and all of Vashon and Maury Islands.

☐     **Kent Area,** defined as:

> All of King County south of Interstate 90 except those areas included in the Seattle Case Assignment Area.

I certify that this case meets the case assignment criteria, described in King County LCR 82(e).

s/Eliot M. Harris ___     36590 _____     _3/15/2024 _____
Signature of Attorney          WSBA Number               Date

or

_____     _____
Signature of person who is starting case               Date

_____
Address, City, State, Zip Code of person who is starting case if not represented by attorney

7865873.1

**KING COUNTY SUPERIOR COURT**
**CASE ASSIGNMENT AREA DESIGNATION and CASE INFORMATION COVER SHEET**

# CIVIL

Please check the category that best describes this case.

**APPEAL/REVIEW**

☐ Administrative Law Review (ALR 2)

(Petition to the Superior Court for review of rulings made by state administrative agencies. Examples: DSHS Child Support, Good to Go passes, denial of benefits from Employment Security, DSHS)

☐ Board of Industrial Insurance Appeals – Workers Comp (ALRLI 2)*

(Petition to the Superior Court for review of rulings made by Labor & Industries.)

☐ DOL Revocation (DOL 2)*

(Appeal of a DOL revocation Implied consent- Test refusal ONLY.) RCW 46.20.308(9)

☐ Petition to Appeal/Amend Ballot Title (BAT 2)

☐ Subdivision Election Process Review (SER 2)*

☐ Voter Election Process Law Review (VEP 2)*

(Complaint for violation of voting rights act)

**CONTRACT/COMMERCIAL**

☐ Breach of Contract (COM 2)*

(Complaint involving money dispute where a breach of contract is involved.)

☐ Commercial Contract (COM 2)*

(Complaint involving money dispute where a contract is involved.)

☐ Commercial Non-Contract (COL 2)*

(Complaint involving money dispute where no contract is involved.)

☐ Third Party Collection (COL 2)*

(Complaint involving a third party over a money dispute where no contract is involved.)

**JUDGMENT**

☐ Abstract, Judgment, Another County (ABJ 2)

(A certified copy of a judgment docket from another Superior Court within the state.)

☐ Confession of Judgment (CFJ 2)*

(The entry of a judgment when a defendant admits liability and accepts the amount of agreed-upon damages but does not pay or perform as agreed upon.)

☐ Foreign Judgment (from another State or Country) (FJU 2)

(Any judgment, decree, or order of a court of the United States, or of any state or territory, which is entitled to full faith and credit in this state.)

☐ Tax Warrant or Warrant (TAX 2)

(A notice of assessment by a state agency or self-insured company creating a judgment/lien in the county in which it is filed.)

☐ Transcript of Judgment (TRJ 2)

(A certified copy of a judgment from a court of limited jurisdiction (e.g. District or Municipal court) to a Superior Court.)

\* The filing party will be given an appropriate case schedule at time of filing.
\*\* Case schedule will be issued after hearing and findings.

Civil CICS 07/2023

7865873.1

**PROPERTY RIGHTS**

☐ Condemnation/Eminent Domain (CON 2)*

(Complaint involving governmental taking of private property with payment, but not necessarily with consent.)

☐ Foreclosure (FOR 2)*

(Complaint involving termination of ownership rights when a mortgage or tax foreclosure is involved, where ownership is not in question.)

☐ Land Use Petition (LUP 2)*

(Petition for an expedited judicial review of a land use decision made by a local jurisdiction.) RCW 36.70C.040

☐ Non-Residential Unlawful Detainer (Eviction) (UND 2)

(Commercial property eviction.)

☐ Property Fairness Act (PFA 2)*

(Complaint involving the regulation of private property or restraint of land use by a government entity brought forth by Title 64.)

☐ Quiet Title (QTI 2)*

(Complaint involving the ownership, use, or disposition of land or real estate other than foreclosure.)

☐ Residential Unlawful Detainer (Eviction) (UND 2)

(Complaint involving the unjustifiable retention of lands or attachments to land, including water and mineral rights.)

**OTHER COMPLAINT/PETITION**

☐ Action to Compel/Confirm Private Binding Arbitration (CAA 2)

(Petition to force or confirm private binding arbitration.)

☐ Application for Health & Safety Inspection (HSI 2)

☐ Assurance of Discontinuance (AOD 2)

(Filed by Attorney General's Office to prevent businesses from engaging in improper or misleading practices.)

☐ Birth Certificate Change(PBC 2)

(Petition to amend birth certificate)

☐ Bond Justification (PBJ 2)

(Bail bond company desiring to transact surety bail bonds in King County facilities.)

☐ Certificate of Rehabilitation (CRR 2)

(Petition to restore civil and political rights.)

☐ Certificate of Restoration Opportunity(CRP 2)

(Establishes eligibility requirements for certain professional licenses.)

☐ Change of Name (CHN 2)

(Petition for name change for reasons other than listed in RCW 4/24/130(5).)

☐ Confidential Change of Name (CHN 2)

(Petition for name change when domestic violence/anti-harassment issues require confidentiality under RCW 4/24/130(5).)

☐ Civil Commitment (sexual predator) (PCC 2)

(Petition to detain an individual involuntarily.)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

☐ Consumer Protection Act (CPA 2)*

(Complaint involving unfair and deceptive acts or practices.)

☐ Emancipation of Minor (EOM 2)

(Petition by a minor for a declaration of emancipation.)

☐ Employment (EMP 2)*

(Complaint regarding compliance with public employers sharing employee information with bargaining representatives.)

☐ Foreign Subpoena (OSS 2)

(To subpoena a King County resident or entity for an out of state case.)

☐ Frivolous Claim of Lien (FVL 2)

(Petition or Motion requesting a determination that a lien against a mechanic or materialman is excessive or unwarranted.)

☐ Injunction (INJ 2)*

(Complaint/petition to require a person to do or refrain from doing a particular thing.)

☐ Interpleader (IPL 2)

(Petition for the deposit of disputed earnest money from real estate, insurance proceeds, and/or other transaction(s).)

☐ Malicious Harassment (MHA 2)*

(Suit involving damages resulting from malicious harassment.) RCW 9a.36.080

☐ Minor Work Permit (MWP 2)

(Petition for a child under 14 years of age to be employed)

☐ Non-Judicial Filing (NJF 2)

(See probate section for TEDRA agreements. To file for the record document(s) unrelated to any other proceeding and where there will be no judicial review.)

☐ Notice of Deposit of Surplus Funds (DSF 2)

(Deposit of extra money from a foreclosure after payment of expenses from sale and obligation secured by the deed of trust.)

☒ Other Complaint/Petition (MSC 2)*

(Filing a Complaint/Petition for a cause of action not listed)

☐ Perpetuation of Testimony (PPT 2)

(Action filed under CR 27)

☐ Petition to Remove Restricted Covenant (RRC 2)

Declaratory judgment action to strike discriminatory provision of real property contract.

☐ Public records Act (PRA 2)*

(Action filed under RCW 42.56)

☐ Receivership (RCVR 2)

(The process of appointment by a court of a receiver to take custody of the property, business, rents and profits of a party to a lawsuit pending a final decision on disbursement or an agreement.)

☐ Relief from Duty to Register (RDR 2)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

(Petition seeking to stop the requirement to register.)

☐ Restoration of Firearm Rights (RFR 2)

(Petition seeking restoration of firearms rights under RCW 9.41.040 and 9.41.047.)

☐ School District-Required Action Plan (SDR 2)

(Petition filed requesting court selection of a required action plan proposal relating to school academic performance.)

☐ Seizure of Property from the Commission of a Crime-Seattle (SPC 2)*

(Seizure of personal property which was employed in aiding, abetting, or commission of a crime, from a defendant after conviction.)

☐ Seizure of Property Resulting from a Crime-Seattle (SPR 2)*

(Seizure of tangible or intangible property which is the direct or indirect result of a crime, from a defendant following criminal conviction. (e.g., remuneration for, or contract interest in, a depiction or account of a crime.))

☐ Structured Settlements- Seattle (TSS 2)*

(A financial or insurance arrangement whereby a claimant agrees to resolve a personal injury tort claim by receiving periodic payments on an agreed schedule rather than as a lump sum.)

☐ Vehicle Ownership (PVO 2)*

(Petition to request a judgment awarding ownership of a vehicle.)

**TORT, ASBESTOS**

☐ Personal Injury (ASP 2)*

(Complaint alleging injury resulting from asbestos exposure.)

☐ Wrongful Death (ASW 2)*

(Complaint alleging death resulting from asbestos exposure.)

**TORT, MEDICAL MALPRACTICE**

☐ Hospital  (MED 2)*

(Complaint involving injury or death resulting from a hospital.)

☐ Medical Doctor (MED 2)*

(Complaint involving injury or death resulting from a medical doctor.)

☐ Other Health care Professional (MED 2)*

(Complaint involving injury or death resulting from a health care professional other than a medical doctor.)

**TORT, MOTOR VEHICLE**

☐ Death (TMV 2)*

(Complaint involving death resulting from an incident involving a motor vehicle.)

☐ Non-Death Injuries (TMV 2)*

(Complaint involving non-death injuries resulting from an incident involving a motor vehicle.)

☐ Property Damages Only (TMV 2)*

(Complaint involving only property damages resulting from an incident involving a motor vehicle.)

☐ Victims Vehicle Theft (VVT 2)*

(Complaint filed by a victim of car theft to recover damages.)  RCW 9A.56.078

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

**TORT, NON-MOTOR VEHICLE**

☐ Other Malpractice (MAL 2)*

(Complaint involving injury resulting from other than professional medical treatment.)

☐ Personal Injury (PIN 2)*

(Complaint involving physical injury not resulting from professional medical treatment, and where a motor vehicle is not involved.)

☐ Products Liability (TTO 2)*

(Complaint involving injury resulting from a commercial product.)

☐ Property Damages (PRP 2)*

(Complaint involving damage to real or personal property excluding motor vehicles.)

☐ Property Damages-Gang (PRG 2)*

(Complaint to recover damages to property related to gang activity.)

☐ Tort, Other (TTO 2)*

(Any other petition not specified by other codes.)

☐ Wrongful Death (WDE 2)*

(Complaint involving death resulting from other than professional medical treatment.)

**WRIT**

☐ Habeas Corpus (WHC 2)

(Petition for a writ to bring a party before the court.)

☐ Mandamus (WRM 2)**

(Petition for writ commanding performance of a particular act or duty.)

☐ Review (WRV 2)**

(Petition for review of the record or decision of a case pending in the lower court; does not include lower court appeals or administrative law reviews.)

\* The filing party will be given an appropriate case schedule at time of filing.
\*\* Case schedule will be issued after hearing and findings.

Civil CICS 07/2023

7865873.1