UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SOPHIE HARTMAN, et al., | CASE NO. C24-0554JLR |
| Plaintiffs, | ORDER |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF CHILDREN YOUTH AND FAMILIES, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court are five motions:  (1) Defendants Seattle Children's Hospital

("SCH"), Nancy Chase, Dr. Beth Webb Nauert, Dr. Rebecca T. Wiester, Dr. Mark S.

Wainwright, Dr. Timothy J. Brei, Dr. Lusine Ambartsumyan, and Dr. Helen L. Dichek's

(collectively, the "SCH Defendants") motion to dismiss (SCH MTD (Dkt. # 16); *see* SCH

MTD Reply (Dkt. # 37); SCH MTD Resp. (Dkt. # 29)); (2) Defendant Virginia Whalen's

motion to dismiss (Whalen MTD (Dkt. # 18); *see* Whalen MTD Reply (Dkt. # 36);

1   Whalen MTD Resp. (Dkt. # 31)); (3) Defendant State of Washington Department of

2   Children, Youth and Families's ("DCYF") motion to dismiss (DCYF MTD (Dkt. # 32);

3   *see* DCYF MTD Reply (Dkt. # 44); DCYF MTD Resp. (Dkt. # 43)); (4) Plaintiffs Sophie

4   Hartman, M.H., and C.H.'s (together, "Plaintiffs") first motion for leave to amend their

5   complaint (1st MFL (Dkt. # 22); *see* 1st MFL Reply (Dkt. # 42); 1st MFL Resp. (Dkt.

6   # 33)); and (5) Plaintiffs' second motion for leave to amend their complaint (2d MFL

7   (Dkt. # 45)).  The court has considered the parties' submissions, the relevant portions of

8   the record, and the governing law.  Being fully advised,[1] the court (1) GRANTS the SCH

9   Defendants' motion to dismiss, (2) GRANTS Ms. Whalen's motion to dismiss,

10  (3) GRANTS DCYF's motion to dismiss, (4) GRANTS in part and DENIES in part

11  Plaintiffs' first motion for leave to amend their complaint, and (5) GRANTS Plaintiffs'

12  second motion for leave to amend their complaint.[2]

13              **II.    BACKGROUND**

14        This case arises out of investigations of Ms. Hartman for suspected medical child

15  abuse conducted by DCYF and SCH's Safe Child and Adolescent Network ("SCAN").

16  In 2015, Ms. Hartman adopted two daughters, C.H. and M.H., from Zambia.  (*See*

17  Compl. (Dkt. # 1-1) ¶ 32.)  At that time, C.H. was approximately one year old and M.H.

18

19        [1]  The court concludes that oral argument would not aid in its disposition of these
    motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all
20  motions will be decided by the court without oral argument.").

21        [2]  Because the court ultimately grants Plaintiffs leave to amend their complaint, *see infra*
    §§ III.A-C, the court exercises its discretion to rule on Plaintiffs' second motion for leave to
    amend their complaint before the noting date.  *See* Fed. R. Civ. P. 1 (stating that the Federal
22  Rules of Civil Procedure "should be construed . . . to secure the just, speedy, and inexpensive
    determination of every action and proceeding").

1  was approximately five years old.  (*See id.* ¶¶ 33-34.)  Ms. Hartman claims to have

2  noticed that C.H. had certain "deficits" since her infancy, including "cognitive

3  impairment, developmental delay, and gastrointestinal issues."  (*Id.* ¶ 38.)  Shortly after

4  the adoptions were finalized, Ms. Hartman "decided it would be in the best interest of her

5  daughters to move the family to the United States in order to access quality medical care

6  for C.H."  (*Id.* ¶ 39.)  The family moved to Washington State.  (*Id.* ¶ 40.)

7         C.H. began seeing specialists at SCH in the fall of 2015.  (*See id.* ¶ 42.)  In 2016,

8  an SCH neurologist diagnosed C.H. with static encephalopathy and cerebral palsy with

9  left hemiplegia.  (*Id.* ¶ 43.)  Over the next several months, C.H.'s physicians referred her

10  for early intervention services including occupational, physical, feeding, and oral therapy

11  and a swallow study; they also recommended that C.H. use mobility equipment,

12  including an adaptive stroller and wheelchair.  (*Id.* ¶¶ 46-47, 53.)  Ms. Hartman also

13  expressed concerns about C.H.'s frequent vomiting, which led to C.H. receiving a

14  gastrointestinal evaluation at SCH.  (*Id.* ¶¶ 50-51.)  Around December 2016, C.H. began

15  taking anti-seizure medication based on tests "reflecting that C.H. was at risk of

16  seizures."  (*Id.* ¶¶ 54-56.)

17         Plaintiffs allege that, in late 2016 and early 2017, Ms. Hartman "began to notice"

18  that some of the medical providers at SCH "often questioned [her] observations of her

19  daughters."  (*Id.* ¶ 58; *see also id.* ¶ 59 (describing examples of SCH staff dismissing Ms.

20  Hartman's concerns).)  "Based on SCH's dismissal of [Ms. Hartman's] observations and

21  the unanswered questions and disagreement in diagnosis among SCH providers," Ms.

22  Hartman sought a second opinion from specialists at Mary Bridge Children's Hospital

1   ("Mary Bridge").  (*Id.* ¶ 60.)  While at Mary Bridge, C.H. underwent genetic testing,

2   which "showed a variant of the ATP1A3 gene associated with AHC, a rare neurological

3   condition causing recurrent but intermittent episodes of temporary paralysis."  (*Id.* ¶ 67.)

4   According to Ms. Hartman, physicians at Mary Bridge recommended surgical placement

5   of a G-tube to help C.H. avoid AHC episodes.  (*Id.* ¶ 69.)  C.H. underwent the G-tube

6   surgery in July 2017.  (*Id.* ¶ 70.)

7          In mid-2017, on the recommendation of C.H.'s physicians at Mary Bridge, Ms.

8   Hartman spoke on the phone with "one of the world's top AHC specialists":  Dr. Mikati

9   of Duke University's Department of Pediatrics.  (*Id.* ¶¶ 74-75.)  Plaintiffs allege that "Dr.

10  Mikati indicated that he believed that C.H. did have AHC" and recommended that C.H.

11  be evaluated at Duke University.  (*Id.* ¶ 74.)  After a "comprehensive, multi-day

12  evaluation" in April 2018, C.H.'s AHC diagnosis was confirmed.  (*Id.* ¶ 75; *see also id.*

13  ¶ 76 (listing "common episodic symptoms" of AHC).)

14         Back in Washington, a Mary Bridge gastroenterologist referred C.H. to Dr.

15  Ambartsumyan, a gastrointestinal motility specialist at SCH.  (*Id.* ¶ 79.)  In 2018, because

16  C.H. was suffering from "ongoing constipation" and "had not responded to medications,"

17  SCH doctors surgically placed a cecostomy tube into C.H. to assist her in relieving her

18  bowels.  (*Id.* ¶¶ 84-85.)  In late 2018, C.H.'s primary doctor at Mary Bridge retired, and

19  Ms. Hartman began to transition C.H.'s primary care back to SCH to facilitate the

20  coordination of care with AHC experts at Duke University.  (*Id.* ¶ 86.)  Plaintiffs allege

21  that although SCH agreed to coordinate with ACH specialists at Duke, C.H.'s primary

22  //

1    care doctor, and C.H.'s therapists, SCH "systematically failed to follow through with the

2    promised coordination of medical care." (*Id.* ¶¶ 88-90.)

3         Shortly after an initial care coordination meeting at SCH in early 2019, a medical

4    resident "reported a concern about C.H. . . . regarding medical child abuse to SCH's

5    [SCAN] team." (*Id.* ¶ 91.) According to Plaintiffs, "SCAN receives referrals of

6    suspected child abuse or neglect and investigates those reports to determine whether

7    intervention via DCYF is required." (*Id.*) At all relevant times, SCH's SCAN team was

8    led by Dr. Wiester. (*Id.*) Plaintiffs allege that, "from day one, Dr. Wiester suspected

9    medical child abuse" and denied C.H.'s AHC diagnosis. (*See id.* ¶¶ 90.vii-viii, 91, 156.)

10   Plaintiffs quote Dr. Wiester as falsely reporting to DCYF that "[c]onsultation was

11   requested of the [SCAN team] in early 2019 by a group of C.H.'s SCH specialists and

12   providers at Seattle Children's Hospital because of concern regarding a pattern of

13   parental requests for increasingly invasive procedures based on undocumented signs and

14   symptoms reported by the parent." (*Id.* ¶ 93.) Plaintiffs also allege that after an initial

15   meeting in April 2019, Dr. Wiester made comments that, they assert, indicated that the

16   result of the SCAN team's investigation was "foreordained," including that "[w]e must

17   have consensus about this case" and that "[i]t does not sound as if we are there yet." (*Id.*

18   ¶ 97.) Plaintiffs allege that "there" referred to "the launch of the child abuse case." (*Id.*)

19   The SCAN team investigated suspected abuse by Ms. Hartman for 21 months, keeping its

20   records in a confidential file that was separate from C.H.'s standard medical records.

21   (*See id.* ¶¶ 96, 98.)

22   *//*

1    In summer 2020, while the SCAN team's investigation was ongoing, Ms. Hartman

2 "noticed signs of precocious puberty in C.H." (*Id.* ¶ 121.) Plaintiffs allege that Dr.

3 Dichek, C.H.'s endocrinologist, presented Ms. Hartman with the choice of treating C.H.

4 with "regular, monthly injections or a more long-term implant that would provide

5 hormone-suppressant medication." (*Id.* ¶ 123.) Ms. Hartman opted for the implant. (*Id.*)

6 Dr. Wiester expressed her concern over the implant to Dr. Dichek, who later "changed

7 C.H.'s care from hormone therapy for precocious puberty . . . to 'watchful waiting.'" (*Id.*

8 ¶¶ 124, 129.) That change "was not communicated to [Ms. Hartman] until 25 days later."

9 (*Id.* ¶ 130.)

10    Although C.H.'s medical situation had apparently improved by early 2021, on

11 February 18, 2021, a SCAN social worker referred the matter to DCYF for further

12 investigation of suspected medical child abuse. (*Id.* ¶¶ 133-38; *see also id.* ¶¶ 139 (listing

13 alleged false or misleading statements in the referral letter); *id.* ¶ 140 (listing information

14 that Plaintiffs assert should have been included in the letter).) The referral letter was

15 endorsed by Defendants Dr. Wiester, Dr. Brei, Dr. Ambartsumyan, Dr. Wainwright, and

16 Ms. Chase, all of whom informed DCYF that "they had – as experts – found child

17 abuse." (*See id.* ¶¶ 138-39.) Plaintiffs allege that this letter was the culmination of a

18 "years-long witch-hunt, led by Dr. Wiester, to find medical child abuse where there was

19 no evidence of abuse." (*Id.* ¶ 91.) Plaintiffs characterize the SCAN team's investigation

20 as a "secret" and "wild inquisition," during which Dr. Wiester ignored exculpatory,

21 "objective medical evidence establishing that no abuse was taking place." (*Id.* ¶¶ 98-99,

22 //

102, 106 (capitalization altered).)  Plaintiffs accuse the SCH Defendants of being "so

eager for child abuse cases that [they] made one up." (*Id.* ¶¶ 93, 98.)

On March 17, 2021, approximately one month after the SCAN team contacted

DCYF about Ms. Hartman, Defendant Detective O'Rourke of the City of Renton Police

Department removed C.H. and M.H. from Ms. Hartman's custody.  (*Id.* ¶ 141.)  Plaintiffs

allege that, after her removal from Ms. Hartman, C.H. "was involuntarily forced into a

16-day hospitalization . . . during which she was observed by SCH staff." (*Id.* ¶ 152.)

SCH appointed Dr. Nauert, a SCAN team member, as C.H.'s primary care provider.  (*Id.*

¶ 156.)  Shortly thereafter, DCYF initiated a dependency action—allegedly relying on the

SCAN team's "dogma"—and Ms. Whalen was assigned as a guardian *ad litem* to

independently advocate for C.H.  (*Id.* ¶¶ 158-59.)

In May 2021, the King County Prosecuting Attorney's Office brought charges

against Ms. Hartman for two counts of felony assault.  (*Id.* ¶ 160.)  A "media frenzy"

erupted.  (*Id.* ¶ 161.)  News headlines read that Ms. Hartman, a "white, Jesus-loving

former missionary," had "callously abused her adopted black child," subjected C.H. "to

[an] unnecessary feeding tube, wheelchair, [and] hundreds of medical appointments," and

"went on a PR tour for her sick, adopted African child."  (*Id.* ¶¶ 162-63 (capitalization

altered).)

After 14 months, including a 49-day trial, Ms. Hartman succeeded in defending

against the dependency action.  (*Id.* ¶¶ 165-68.)  Plaintiffs allege, however, that funding

Ms. Hartman's defense in the dependency action left her without the financial resources

necessary to fund a criminal defense.  (*Id.* ¶ 168.)  This, "[i]n essence," "deprived" Ms.

1 Hartman of the "financial ability to fight back against the criminal charges," which she

2 asserts were based on the same "false and misleading statements and misconduct" that

3 led to the dependency action.  (*Id.*)  As a result, Ms. Hartman claims to have been "forced

4 into entering an 'agreement' with the criminal prosecutor, under which SCH . . . would

5 have control over C.H.'s care until November 29, 2023 . . . in exchange for reducing the

6 criminal charges against [Ms. Hartman] from felonies to a single, non-specific

7 misdemeanor."  (*Id.* ¶¶ 168-69.)

8      Plaintiffs allege that they have spent over $2,850,000 "fighting the baseless

9 allegations against them and ill-founded criminal charges brought at the urging of SCH

10 and DCYF."  (*Id.* ¶ 164.)  Ms. Hartman believes she is the victim of numerous

11 "Orwellian intrusions" made in an effort "to destroy the Hartman family."  (*Id.* ¶ 8.)

12 Having succeeded in the dependency action, Ms. Hartman is now suing SCH and the

13 practitioners involved in the treatment of C.H. and investigation of Ms. Hartman; DCYF

14 and two of its employees; the City of Renton Police Department and Detective O'Rourke;

15 Ms. Whalen; and the Washington Court Appointed Special Advocate Association

16 ("CASA").[3]  (*See generally* Compl.)

17                **III.    ANALYSIS**

18      Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint

19 upon the plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R.

20

21      [3]  Plaintiffs concede that they improperly named CASA as a defendant in this matter and
that "the proper Defendant is King County Dependency Court Appointed Special Advocate
22 Association, via King County."  (2d MFL at 2-3.)

Civ. P. 12(b)(6).  A Rule 12(b)(6) dismissal may "be based on the lack of a cognizable

legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  A plaintiff's

complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the pleading standard

announced by Federal Rule of Civil Procedure 8 does not require "detailed factual

allegations," it demands more than "an unadorned, the-defendant-unlawfully-harmed-me

accusation."  *Id.* (requiring the plaintiff to "plead[] factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged"

(citing *Twombly*, 550 U.S. at 556)); *see also* Fed. R. Civ. P. 8(a)(2).

　　　When considering a Rule 12(b)(6) motion, the court takes the well-pleaded factual

allegations as true and views such allegations in the light most favorable to the plaintiff.

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  The

court need not, however, accept as true a legal conclusion presented as a factual

allegation, *Iqbal*, 556 U.S. at 678, nor is the court required to accept as true "allegations

that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences,"

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  An order granting

a motion to dismiss a complaint "must be accompanied by leave to amend unless

amendment would be futile."  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979,

983 (9th Cir. 2000).

//

1    **A.    SCH Defendants' Motion to Dismiss**[4]

2        The SCH Defendants argue that Plaintiffs' claims should be dismissed for three

3    reasons.  The "primary basis" for the SCH Defendants' motion is that RCW 26.44.060

4    provides them immunity against all of Plaintiffs' claims because the claims arise from

5    their conduct related to reporting suspected child abuse.  (SCH MTD at 6, 10-16.)

6    Alternatively, the SCH Defendants argue that RCW 7.70, which provides the exclusive

7    remedy for claims occurring as a result of health care, bars all of Plaintiffs' claims except

8    their medical malpractice claim.  (*Id.* at 17.)  Finally, the SCH Defendants argue that

9    Plaintiffs' claim for violation of the right to privacy also fails because Plaintiffs cannot

10   make out a *prima facie* claim.  (SCH MTD Reply at 11-12.)  The court considers these

11   arguments in turn.

12       1.    <u>RCW 26.44.060</u>

13       The SCH Defendants argue that they are "entitled to the immunity afforded to

14   health care providers evaluating, reporting, testifying, or otherwise assisting in cases of

15   suspected child abuse under RCW 26.44.060(1)."  (SCH MTD at 12.)  They further argue

16   that the immunity extends to all of Plaintiffs' claims, "which are entirely predicated on

17   [the SCH Defendants'] investigation, medical evaluation, and reporting of suspected

18

19       [4] Plaintiffs clarify in their response that all of the claims they assert against the SCH
Defendants arise out of state law.  (SCH MTD Resp. at 13.)  Thus, the court need not consider

20   whether the SCH Defendants have immunity from federal claims under 34 U.S.C. § 20342 and
whether they are entitled to attorneys' fees under that statute.  (*See* SCH MTD at 6-7, 18.)  The

21   court also need not consider Plaintiffs' false imprisonment claim against SCH because Plaintiffs
"concede that they have not made sufficient fact allegations against SCH to support their claim"
and acknowledge that the "inclusion of 'SCH' in Count IV was an error."  (SCH MTD Resp. at

22   13 n.3.)

1   child abuse." (*Id.* at 16.)  Plaintiffs counter that "the facts [in their complaint] allege an

2   absence of good faith"—meaning immunity does not attach—and, regardless, "RCW

3   26.44.060 does not provide immunity from 'negligent treatment or investigation giving

4   rise to the report.'"  (SCH MTD Resp. at 3, 17 (quoting *Webb v. Neuroeduc. Inc., P.C.*,

5   88 P.3d 417, 422 (Wash. Ct. App. 2004)).)  The court agrees with the SCH Defendants.

6         RCW 26.44.060 provides that

7   > any person participating in good faith in the making of a report pursuant to
8   > this chapter, testifying as to alleged child abuse or neglect in a judicial
    > proceeding, or otherwise providing information or assistance, including
9   > medical evaluations or consultations, in connection with a report,
    > investigation, or legal intervention pursuant to a good faith report of child
10  > abuse or neglect shall in so doing be immune from any civil or criminal
    > liability arising out of such reporting or testifying under any law of this state
    > or its political subdivisions.

11  RCW 26.44.060(1)(a).  The statute's purpose is "to encourage the reporting of child

12  abuse."  *Whaley v. Washington*, 956 P.2d 1100, 1106 (Wash. Ct. App. 1998).  Immunity

13  attaches so long as the reporter acted in "good faith" and has not been convicted of

14  "knowingly mak[ing] a false report of alleged abuse or neglect."  *See* RCW

15  26.44.060(1)(b), (4).  "The standard definition of good faith is a state of mind indicating

16  honesty and lawfulness of purpose."  *Whaley*, 956 P.2d at 1106.  Good faith is not "based

17  on what the reporter reasonably should have known."  *Id.*  Nor does it require "that

18  information giving rise to a suspicion of child abuse be investigated or verified before it

19  is reported."  *Id.*[5]  To survive a motion to dismiss pursuant to RCW 26.44.060, the

20

21       [5] In their brief, Plaintiffs represent the law as follows:  "While the purpose of
22  Washington's mandatory reporter statute is to 'encourage those in the position to suspect child

1  complaint must "plausibly allege[] that the [defendants] did not act in good faith when

2  they examined [the p]laintiff's children and reported their findings of abuse." *Grae-El v.*

3  *City of Seattle*, No. C21-1678JLR, 2022 WL 602593, at *6-7 (W.D. Wash. Mar. 1, 2022)

4  (granting motion to dismiss because the plaintiffs "failed to allege any facts that would

5  defeat [the defendants'] claim to immunity under RCW 26.44.060").

6         Here, Plaintiffs have failed to plausibly allege that the SCH Defendants did not act

7  in good faith when they provided "information or assistance, including medical

8  evaluations or consultations, in connection with a report" of child abuse.  RCW

9  26.44.060(1)(a).  Plaintiffs make no allegation that any of the SCH Defendants have been

10  convicted of knowingly making a false report of alleged abuse or neglect.  *See* RCW

11  26.44.060(1)(b), (4).  (*See generally* Compl.)  And Plaintiffs' allegations that the SCH

12  Defendants' report "was not made in good faith" are conclusory, contradictory, and

13  implausible.  (*See* Compl. ¶ 248.)

14         The pleaded facts in Plaintiffs' complaint cannot support the inflammatory tale

15  they weave of a "witch-hunt" or "inquisition" executed by persons "akin to Lavrentiy

16  

17  abuse to report it[,]' that purpose is undermined *if immunity can be found* even when a report was
   'unverified or lacked investigation.'"  (SCH MTD Resp. at 17 (quoting *Yuille v. Washington*, 45
   P.3d 1107, 1111 (Wash. Ct. App. 2002)) (emphasis added).)  Plaintiffs' representation is

18  flagrantly misleading.  *Yuille* actually states that RCW 26.44.060's "purpose would be
   undermined *if immunity fell* with a showing that the report was unverified or lacked

19  investigation."  *Yuille*, 45 P.3d at 1111 (emphasis added); *see also id.* ("The statute does not
   require that the information giving rise to the suspicion of abuse be investigated or verified

20  before it is reported.").  Thus, *Yuille* does not suggest that the immunity statute's purpose would
   be furthered if unverified reports could give rise to liability, and the case lends no support to

21  Plaintiffs' position.  Plaintiffs' counsel are reminded that they have a duty to avoid making false
   statements of the law to the court.  *See* Wash. RPC § 3.3(a)(1).  Mr. Shlansky, Mr. Hagan, and

22  Mr. Harris are warned that future misrepresentations of the law may result in sanctions and
   referrals to the relevant state bar associations.

1  Pavlovich Beria, Chief of the Soviet Secret Police under Joseph Stalin." (*Id.* ¶¶ 98, 102,

2  155.) Plaintiffs brazenly accuse the SCH Defendants of being "so eager for child abuse

3  cases that [they] made one up." (*Id.* ¶ 93.) That allegation, however, is implausible in

4  light of Plaintiffs' non-conclusory allegations, which demonstrate that C.H.'s providers

5  worked for 21 months to reach a consensus on whether the SCAN team should report Ms.

6  Hartman to DCYF. (*Id.* ¶ 97.)

7      Plaintiffs allege that in April 2019, a medical resident "reported a concern about

8  C.H. . . . regarding medical child abuse." (*Id.* ¶¶ 91, 93.) According to Dr. Wiester, the

9  SCAN team then became involved "because of concern regarding a pattern of parental

10 requests for increasingly invasive procedures based on undocumented signs and

11 symptoms reported by the parent." (*Id.* ¶ 93.) At the outset of the investigation, Dr.

12 Wiester expressed the importance of "hav[ing] consensus about this case" and recognized

13 that it did not yet seem that the team had reached that consensus. (*Id.* ¶ 97.) The SCAN

14 team then investigated the suspected child abuse over the next 21 months, keeping its

15 investigation confidential. (*Id.* ¶ 98.) During that time, neurologists, gastroenterologists,

16 and other specialists continued to treat C.H. for her presenting and reported medical

17 symptoms while monitoring her for potential discrepancies. (*See id.* ¶¶ 91-138.) Upon

18 reaching a consensus in February 2021, the SCAN team reported suspected abuse of C.H.

19 to DCYF in a letter endorsed by Dr. Wiester, Dr. Brei, Dr. Ambartsumyan, Dr.

20 Wainwright, and Ms. Chase. (*See id.* ¶¶ 138-39.)

21     Plaintiffs' efforts to portray the SCAN team's investigation and report as a covert

22 ruse to separate Ms. Hartman from her children fail to plausibly suggest an absence of

good faith.  First, Plaintiffs argue that Dr. Wiester made "a false statement" when she reported to DCYF that "[c]onsultation was requested of the [SCAN team] in early 2019 by a group of C.H.'s SCH specialists and providers at [SCH]" because the consultation was actually requested "by a resident, a physician in training."  (SCH MTD Resp. at 16 (quoting Compl. ¶ 93).)  But Plaintiffs also allege that Dr. Wiester was involved "from day one" and that the resident had been "working from" Dr. Wiester's "narrative," meaning other specialists and providers must have been involved at the time the resident requested consultation from the SCAN team.  (*See* Compl. ¶ 93.)

Second, Plaintiffs argue that the report "misrepresented C.H.'s medical records and made material omissions."  (SCH MTD Resp. at 16 (citing Compl. ¶ 140).)  Plaintiffs allege that Dr. Wiester "cherry-picked information from C.H.'s records that support[s] her false claim of medical child abuse."  (Compl. ¶ 140.)  For example, Plaintiffs describe as "[n]otably absent" from the SCAN team's report certain notes created in 2019, nearly two years before the SCAN team submitted its report.  (*See id.*)  Good faith does not, however, require the submission of all potentially exculpatory information alongside a report of child abuse; indeed, it does not even require information be verified before it is reported.  *See Yuille*, 45 P.3d at 1111.  Moreover, as the SCH Defendants argue, "[a] differential diagnosis may change over the course of treatment," and "[t]he fact that a provider disagreed with or later changed their mind about a diagnosis does not equate to bad faith."  (SCH MTD Reply at 7.)

Third, Plaintiffs argue that a "credible report" would have required immediate action in 2019 instead of a lengthy internal investigation, the findings of which were not

1   sent to DCYF until 2021.  (SCH MTD Resp. at 16-17.)  Plaintiffs again contradict

2   themselves.  Plaintiffs cannot reasonably argue that the SCH Defendants were under an

3   obligation to "immediately" report to DCYF while simultaneously criticizing them for

4   making a report that was somehow "unverified or lacked investigation." (*Id.*)

5   Regardless, the statute immunizes persons who participate "in the making of a report" or

6   otherwise provide "information or assistance, including medical evaluations or

7   consultations, in connection with a report[ or] investigation." RCW 26.44.060(a)(1).

8   There is no provision limiting immunity to only those who act within a certain timeframe.

9   (*See generally id.*)

10        Finally, Plaintiffs argue that RCW 26.44.060 does not immunize negligent

11   treatment or investigation giving rise to a report.  (SCH MTD Resp. at 17.)  In support of

12   this position, Plaintiffs rely on *Dunning v. Pacerelli*, 818 P.2d 34, 38 (Wash. Ct. App.

13   1991), and *Webb*, 88 P.3d at 422.  (*Id.*)  Those opinions, however, were issued before

14   RCW 26.44.060 was amended in 2020 to provide immunity to those who "otherwise

15   provid[e] information or assistance, including medical evaluations or consultations, ***in***

16   ***connection with a report***, investigation, or legal intervention pursuant to a good faith

17   report of child abuse or neglect." *Compare* RCW 26.44.060(1)(a) (2024) (emphasis

18   added), *with* RCW 26.44.060 (2005) (including none of the quoted language).  Here,

19   Plaintiffs allege that Dr. Wiester suspected child abuse "from day one" and that the

20   medical resident's report was "the catalyst for a years-long witch-hunt . . . to find medical

21   child abuse." (Compl. ¶ 91.)  Taking Plaintiffs' allegations as true, the court concludes

22   that that the SCH Defendants undertook the allegedly unlawful conduct in connection

1    with the SCAN team's report to DCYF and thus are immune from suit pursuant to RCW

2    26.44.060(1).

3         Because Plaintiffs have failed to allege facts giving rise to a plausible inference

4    that the SCH Defendants did not act in good faith, they have failed to overcome the

5    immunity bar under RCW 26.44.060(1).  The court therefore dismisses Plaintiffs' claims

6    against the SCH Defendants.

7         2.    RCW 7.70.030

8         Although the court has dismissed Plaintiffs' claims against the SCH Defendants

9    pursuant to RCW 26.44.060(1), it must nevertheless consider the SCH Defendants'

10   alternative arguments to determine whether it would be futile to grant Plaintiffs leave to

11   amend their complaint.  Any claim preempted by RCW 7.70 must be dismissed with

12   prejudice, as leave to amend would be futile.

13        The SCH Defendants assert that Plaintiffs' claims for battery, invasion of privacy,

14   negligent reporting of medical child abuse, negligent investigation of medical child

15   abuse, intentional infliction of emotional distress, negligent infliction of emotional

16   distress, negligent supervision, and defamation are precluded by RCW 7.70 *et seq.*, which

17   provides the exclusive remedy for injuries occurring as a result of health care.  (SCH

18   MTD at 17.)  Plaintiffs respond that their claims are not precluded because they "are not

19   based on injury from 'health care.'"  (SCH MTD Resp. at 20.)  The court agrees in part

20   with the SCH Defendants and in part with Plaintiffs.

21   //

22   //

1    "[W]henever an injury occurs as a result of health care, the action for damages for

2    that injury is governed exclusively by RCW 7.70." *Branom v. Washington*, 974 P.2d

3    335, 338 (Wash. Ct. App. 1999).  RCW 7.70.030 provides that

4            No award shall be made in any action or arbitration for damages for injury
        occurring as the result of health care  . . ., unless the plaintiff establishes one
5        or more of the following propositions:  (1) That injury resulted from the
        failure of a health care provider to follow the accepted standard of care;
6        (2) That a health care provider promised the patient or his or her
        representative that the injury suffered would not occur; [or] (3) That injury
7        resulted from health care to which the patient or his or her representative did
        not consent.

8    RCW 7.70.030.

9            RCW 7.70 "sweeps broadly" and applies to "all civil actions for damages for

10   injury occurring as a result of health care, regardless of how the action is characterized."

11   *Branom*, 974 P.2d at 338.  "'[H]ealth care' under RCW 7.70 is the process by which any

12   health care provider uses the skills they have been taught to examine, diagnose, treat, or

13   care for the plaintiff as their patient." *M.N. v. MultiCare Health Sys., Inc.*, 541 P.3d 346,

14   352 (Wash. 2024) (holding that patients' claim against hospital for negligently

15   supervising a nurse suspected of exposing patients to hepatitis C arose as a result of

16   health care).  "Patient" "can have a generic meaning as someone who has an interaction

17   with a health care provider without forming a traditional physician-patient relationship."

18   *Reagan v. Newton*, 436 P.3d 411, 419 (Wash. Ct. App. 2019) (explaining that "the

19   definition of 'health care provider' in RCW 7.70.020(1) includes service providers who

20   do not have formal relationships with the patient").

21   //

22

ORDER - 17

1    "Courts have interpreted 'injuries resulting from health care' . . . to encompass

2    scenarios not involving traditional patient care."  *Id.* at 417 (first citing *Berger v.*

3    *Sonneland*, 26 P.3d 257, 269 (Wash. 2001) (holding that physician's unauthorized

4    disclosure of confidential patient information to the patient's ex-husband resulted from

5    health care); and then citing *Branom*, 974 P.2d at 339-40 (holding that financial and

6    emotional distress injuries to parents arising from physician's alleged failure to inform

7    them of their infant's medical condition resulted from health care—and thus precluded

8    parents' negligent infliction of emotional distress claim—even though physician did not

9    treat the parents)).  "On the other hand, courts have declined to hold that other types of

10   claims against physicians involved 'injuries resulting from health care.'"  *Id.* (first citing

11   *Young v. Savidge*, 230 P.3d 222, 229-30 (Wash. Ct. App. 2010) (holding that dentist's

12   intentional misrepresentation regarding the composition of a crown he installed did not

13   result from health care); and then citing *Est. of Sly v. Linville*, 878 P.2d 1241, 1245-46

14   (Wash. Ct. App. 1994) (holding that physician's misrepresentation to a patient regarding

15   his opinion on the quality of the care the patient had previously received from the

16   physician's colleague did not result from health care)).  Washington courts have clarified

17   that claims resulting "from misrepresentations made by" a provider are not the result of

18   "health care," even if the misrepresentations were "made during the course of the

19   physician/patient relationship."  *Linville*, 878 P.2d at 1245-46.

20       The court now applies these principles to determine whether RCW 7.70 preempts

21   Plaintiffs' causes of action on a claim-by-claim basis.

22   //

1    First, RCW 7.70 does not preempt Plaintiffs' battery claim because the statute

2 "does not supersede the common law cause of action for medical battery." *Branom*, 974

3 P.2d at 421 (citing *Bundrick v. Stewart*, 114 P.3d 1204, 1208 (Wash. Ct. App. 2005)); *see*

4 *also Bundrick*, 114 P.3d at 1208 ("Chapter 7.70 RCW preserves actions for failure to

5 obtain consent (common law medical battery) where a health care provider fails to obtain

6 any consent[.]").

7    Second, RCW 7.70 does not preempt Plaintiffs' claim against SCH and Dr.

8 Wiester for violation of the right to privacy because the claim does not arise out of Dr.

9 Wiester's treatment of C.H. as her patient but rather the allegedly "false and misleading

10 information about Sophie and C.H.'s care" the SCAN team compiled in a "ghost"

11 medical record and "published to other doctors and staff of SCH."  (*See* Compl.

12 ¶¶ 236-37.)  Taking the allegations in Plaintiffs' complaint as true, the court concludes

13 that this claim arises out of Dr. Wiester's allegedly "meddlesome interference" with

14 C.H.'s care as opposed to Dr. Wiester's care for C.H. as her patient.  (*Id.* ¶ 236; *see id.*

15 ¶ 106 (alleging that the SCH Defendants "concealed" "secret records").)

16    Third, RCW 7.70 does not preempt Plaintiffs' claim for negligent reporting of

17 medical child abuse because the claim does not arise from health care but rather from the

18 misrepresentations the SCH Defendants allegedly made to DCYF.  *See Linville*, 878 P.2d

19 at 1245-46; (Compl. ¶ 248 (alleging that the SCAN team's report contained "a series of

20 false and misleading statements"); *id.* ¶ 250 (alleging that the judge in the dependency

21 action found "that SCAN's process was 'deeply flawed'").)

22 //

1   Fourth, RCW 7.70 does not preempt Plaintiffs' claim against SCH for negligent

2   investigation of medical child abuse because the claim ultimately arises from SCH and

3   Dr. Wiester's "false and misleading" report of child abuse and not Dr. Wiester's care for

4   C.H. as her patient. (*Id.* ¶ 258; *see also id.* ¶ 256 (alleging that DCYF workers "just

5   parroted what SCH and Dr. Wiester reported").) Moreover, the claim is primarily

6   focused against DCYF and the City of Renton Police Department for failing to properly

7   investigate *after* the SCAN team sent its report to DCYF. (*See id.* ¶¶ 253-63.)

8   Fifth, RCW 7.70 preempts in part Plaintiffs' claims for intentional and negligent

9   infliction of emotion distress against the SCH Defendants. To the extent the claims arise

10  from the SCH Defendants' "forced 16-day hospitalization of C.H.," the claims are

11  preempted as squarely arising from health care provided to C.H. as a patient. (*Id.* ¶ 275.)

12  To the extent the claims arise from the SCH Defendants' alleged "negligent reporting of

13  medical child abuse" or the forcible removal of C.H. and M.H. "from their home early in

14  the morning with a police presence and with no prior notice," however, the claims are not

15  preempted. (*Id.* ¶¶ 279, 287.)

16  Sixth, RCW 7.70 preempts Plaintiffs' claim against SCH for negligent supervision

17  and ratification because the underlying harm is the result of SCH's alleged failures "to

18  ensure that C.H. and her family received competent, appropriate treatment and care," "not

19  impose medical decisions or take control of family medical decisions," and "properly

20  train and supervise its physicians, other healthcare providers, and employees and agents

21  involved in C.H.'s 'care.'" (*Id.* ¶¶ 307-08, 310); *see M.N.*, 541 P.3d at 352. The court

22  has little trouble concluding that these alleged injuries are the result of health care.

1        Seventh, RCW 7.70 does not preempt Plaintiffs' claim for defamation because the

2 claim results not from health care but rather "a series of [allegedly] false claims about

3 [Ms. Hartman], including false claims that she is a child abuser, abused and neglected her

4 daughter, C.H., and was an unfit mother." (Compl. ¶ 337.)

5        In sum, RCW 7.70 supersedes Plaintiffs' claim against SCH for negligent

6 supervision and preempts in part Plaintiffs' claims against the SCH Defendants for

7 negligent and intentional infliction of emotional distress. RCW 7.70 does not preempt

8 Plaintiffs' claims for battery, violation of the right to privacy, negligent reporting of

9 medical child abuse, negligent investigation of medical child abuse, and defamation.

10        3.    <u>Right to Privacy</u>

11        Although the court finds that Plaintiffs' claim for violation of the right to privacy

12 does not arise out of "health care"—and thus is not preempted by RCW 7.70—the court

13 considers SCH and Dr. Wiester's alternative argument that Plaintiffs fail to state a

14 plausible claim for violation of the common law right to privacy. (*See* SCH MTD Reply

15 at 11-12.) SCH and Dr. Wiester argue that Plaintiffs fail to plead facts supporting "any of

16 the elements of this claim." (*Id.* at 11.) The court agrees.

17        "Washington recognizes a common law right to privacy." *Mayer v. Huesner*, 107

18 P.3d 152, 155 (Wash. Ct. App. 2005). To state a *prima facie* claim for violation of the

19 right to privacy, the plaintiff must establish that the defendant publicized information

20 concerning the plaintiff's private life that (a) "would be highly offensive to a reasonable

21 person," and (b) "is not of legitimate concern to the public." *Id.* (quoting *Reid v. Pierce*

22 *County*, 961 P.2d 333, 338 (Wash. 1998)). "Publicity" means "communication to the

1  public at large so that the matter is substantially certain to become public knowledge."

2  *Fisher v. Dep't of Health*, 106 P.3d 836, 840-41 (Wash. Ct. App. 2005).

3  "[C]ommunication to a single person or a small group does not qualify."  *Id.* at 841.

4      Here, Plaintiffs fall well short of establishing a *prima facie* case for violation of

5  the right to privacy.  Plaintiffs' claim arises from information contained in the alleged

6  "'ghost' medical record separate from C.H.'s legitimate medical record, in which

7  falsehoods were published."  (Compl. ¶ 236.)  Even assuming without deciding that

8  Plaintiffs satisfy the "highly offensive" and no "legitimate concern" prongs, Plaintiffs fail

9  to establish that SCH and Dr. Wiester publicized any information.  Plaintiffs allege that

10 the "SCAN file" was "secret" and unavailable even to the Hartmans.  (*Id.* ¶ 96.)  At most,

11 Plaintiffs allege that this information was "published to other doctors and staff of SCH."

12 (*Id.* ¶ 237.)  Disclosure of information to that group of professionals, however, is

13 insufficient to state a privacy claim.  *See Fisher*, 106 P.3d at 840-41.  The complaint

14 contains no allegations that SCH or any of its employees disseminated these "secret" files

15 to the public (*see generally* Compl.), and Plaintiffs make no such argument in their

16 opposition brief (*see* SCH MTD Resp. at 10 ("Plaintiffs alleged that SCH publicized

17 C.H.'s 'ghost' medical records . . . to SCH's SCAN team and others, which was available

18 to doctors and other staff at SCH.")).

19     Moreover, Plaintiffs' reliance on *Armijo v. Yakima HMA, LLC*, No.

20 11-CV-3114-TOR, 2012 WL 2576624 (E.D. Wash. July 3, 2012), is misplaced.  (*See*

21 SCH MTD Resp. at 11.)  In *Armijo*, the plaintiff alleged that the defendant disclosed

22 private information to "members of its staff ***and to other members of the public***."

1  *Armijo*, 2012 WL 2576624, at *2 (emphasis added).  Unlike *Armijo*, Plaintiffs' complaint

2  contains no allegations of disclosure to members of the public.  (*See generally* Compl.)

3       The court concludes that Plaintiffs' claim for violation of the right to privacy

4  against SCH and Dr. Wiester fails as a matter of law.  The court also finds that leave to

5  amend this claim would be futile because any allegations of public disclosure in an

6  amended complaint would contradict Plaintiffs' earlier allegations of a "secret 'SCAN

7  file'" kept confidential by SCH.  (*Id.* ¶ 96; *see id.* ¶ 240 (alleging that SCH "denied the

8  existence of these records, until forced to admit the truth" in response to a subpoena));

9  *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt.*, 744 F.3d 595, 600 (9th

10  Cir. 2014) ("A party cannot amend pleadings to 'directly contradic[t] an earlier assertion

11  made in the same proceeding.'" (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.

12  1990))); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990) ("Although

13  leave to amend should be liberally granted, the amended complaint may only allege

14  'other facts consistent with the challenged pleading.'" (quoting *Schreiber Distrib. Co. v.

15  *Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1989))).

16       In sum, the court grants the SCH Defendants' motion to dismiss.  The court

17  dismisses with prejudice Plaintiffs' claims for (1) violation of the right to privacy against

18  SCH and Dr. Wiester, (2) negligent supervision against SCH, and (3) false imprisonment

19  against SCH.  The court dismisses with leave to amend Plaintiffs' claims against the SCH

20  Defendants for medical malpractice, battery, negligent reporting of medical child abuse,

21  negligent investigation of medical child abuse, intentional infliction of emotional distress,

22  negligent infliction of emotional distress, and defamation.

1    **B.      Ms. Whalen's Motion to Dismiss**

2          The court next considers Ms. Whalen's motion to dismiss.  Ms. Whalen argues

3    that Plaintiffs' claims against her for negligent placement and defamation must be

4    dismissed with prejudice because RCW 13.34.105 immunizes her from civil liability.

5    (Whalen MTD at 2-3.)  Ms. Whalen argues that she is entitled to statutory immunity

6    because she was "at all times relevant to the claims alleged in the complaint" "acting as

7    an employee of King County as the court-appointed [guardian *ad litem*] for C.H."  (*Id.*)

8    Plaintiffs respond that Ms. Whalen "acted outside the scope of her duties as a guardian *ad*

9    *litem*" by failing to independently advocate for C.H., failing to investigate C.H.'s medical

10   condition, and objecting to certain of Ms. Hartman's medical requests, and that Ms.

11   Whalen is therefore not immunized by RCW 13.34.105.  (Whalen MTD Resp. at 8.)  The

12   court concludes that Ms. Whalen is immune.

13         RCW 13.34.105 provides that "[a] guardian *ad litem* shall be deemed an officer of

14   the court for the purpose of immunity from civil liability."  RCW 13.34.105(2).  When

15   such "quasi-judicial immunity" applies, "it is an absolute bar to civil liability and

16   necessarily leaves wronged claimants without a remedy."  *West v. Osborne*, 34 P.3d 816,

17   821-22 (Wash. Ct. App. 2001).  When a guardian *ad litem* "is not acting within his [or

18   her] statutory duties," however, he or she "cannot be entitled to quasi-judicial immunity."

19   *Kelley v. Pierce Cnty.*, 319 P.3d 74, 78 (Wash. Ct. App. 2014).  "To determine if

20   immunity applies, Washington courts will look to the function the person is performing,

21   rather than to the person who is performing it."  *Id.* at 77.  "This analysis may require a

22   court to examine the functions of the official as set forth in statute."  *Id.*; *see also id.* at 78

1    ("We have . . . applied quasi-judicial immunity to a [guardian *ad litem*] who was acting

2    within the scope of his statutory duties.").  In relevant part, RCW 13.34.105(1) provides

3    that the guardian *ad litem* shall "investigate, collect relevant information about the child's

4    situation, and report to the court factual information regarding the best interests of the

5    child"; meet with, interview, or observe the child . . . and bring to the court's attention

6    any views or positions expressed by the child on issues pending before the court"; and

7    "represent and be an advocate for the best interests of the child."  RCW 13.34.105(1)(a),

8    (b), (f); *see also* RCW 13.34.105(1)(a)-(h) (listing additional, but not necessarily all,

9    potential duties of a guardian *ad litem*).

10         Here, the allegations in Plaintiffs' complaint, when taken as true, establish that

11   Ms. Whalen was at all relevant times acting within the scope of her statutory duties as

12   C.H.'s guardian *ad litem*.  Plaintiffs allege that although Ms. Whalen "was assigned to be

13   a supposed independent advocate for C.H.," she did not do so.  (Compl. ¶ 159.)  Instead,

14   according to Plaintiffs, "Ms. Whalen objected to [Ms. Hartman's] requests to permit C.H.

15   to resume therapy and attend her annual evaluations at Duke University despite Ms.

16   Whalen's limited training and skill in medical child abuse cases and failure to inquire

17   about the real AHC diagnosis."  (*Id.*)  Plaintiffs also allege that Ms. Whalen "block[ed]

18   access to the real experts and den[ied] the real diagnosis," and "accept[ed] falsehoods to

19   support [her] opinion" "that C.H. was being harmed blindly."  (*Id.*)  Plaintiffs make no

20   further allegations about Ms. Whalen's conduct.  (*See generally id.*)  Guardians *ad litem*,

21   however, are not required to be an expert in any field (*see* RCW 13.34.105), and the fact

22   that Ms. Whalen did not automatically acquiesce to Ms. Hartman's requests demonstrates

1    that she exercised her independent judgment to advocate in C.H.'s best interest.  Plaintiffs

2    may disagree with Ms. Whalen's approach to her duties as guardian *ad litem*, but they

3    simply fail to make any allegations suggesting that Ms. Whalen acted outside the scope

4    of those duties.  (*See generally* Compl.)

5           Accordingly, the court concludes that Ms. Whalen is immune from suit under

6    RCW 13.34.105 and thus dismisses Plaintiffs' claims against Ms. Whalen.  Because

7    Plaintiffs may be able to allege additional facts that plausibly suggest Ms. Whalen failed

8    to perform her statutory duties as guardian *ad litem*, however, the court grants Plaintiffs

9    leave to amend.

10   **C.     DCYF's Motion to Dismiss**

11          The court next considers DCYF's motion to dismiss.  DCYF moves to dismiss

12   Plaintiffs' causes of action under 42 U.S.C. § 1983 because "[n]either a state, nor state

13   agencies, are a 'person' under 42 U.S.C. § 1983."  (DCYF MTD at 2.)[6]  Plaintiffs

14   "concede this" but seek leave "to amend those claims to bring them against the individual

15   employees of DCYF":  Ms. Owens and Ms. Maulden.  (DCYF MTD Resp. at 1-2.)

16   DCYF requests that dismissal against it be with prejudice and that the court deny leave to

17   amend because "Plaintiffs have already sued DCYF employees under 42 U.S.C. § 1983

18   in their individual capacities."  (DCYF MTD Reply at 2.)  Plaintiffs did not, however,

19

20          [6]  DCYF's motion is not text-searchable, which makes it more difficult for the court to
     review.  To the extent possible, all future filings by any party should be in a text-searchable
21   format.  *See* U.S. District Court, Western District of Washington Electronic Filing Procedures for
     Civil and Criminal Cases (Apr. 30, 2024) at 3, available at
22   https://www.wawd.uscourts.gov/sites/wawd/files/ECFFilingProcedures.pdf
     [https://perma.cc/JZE2-QT4C].

1    bring all of their Section 1983 claims against Ms. Owens and Ms. Maulden.  (*See* Compl.

2    at 66-67 (alleging Section 1983 claims against DCYF but not Ms. Owens and Ms.

3    Maulden).)

4         Accordingly, the court grants DCYF's motion to dismiss and dismisses Plaintiffs'

5    Section 1983 claims against DCYF with prejudice.  The court also grants Plaintiffs'

6    request for leave to amend to assert claims against Ms. Owens and Ms. Maulden.

7    **D.   Motions for Leave to Amend Complaint**

8         1.   <u>First Motion for Leave to Amend</u>

9         Plaintiffs' first motion seeks leave "to assert official-capacity claims against

10   Owens, Maulden, and O'Rourke to make it clear that DCYF and CRPD are liable under a

11   theory of *respondent superior*."  (1st MFL at 4; *see also* Redlined Prop. Am. Compl.

12   (Dkt. # 22-2) (showing Plaintiffs' proposed amendments).)  The court grants in part and

13   denies in part this request.

14        The court denies Plaintiffs' request with respect to any claims brought under 42

15   U.S.C. § 1983 because such amendments would be futile.  *See Taylor v. List*, 880 F.2d

16   1040, 1045 (9th Cir. 1989) ("There is no *respondeat superior* liability under section

17   1983."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 92 (1989) ("We hold that

18   neither a State nor its officials acting in their official capacities are 'persons' under

19   § 1983.").  Although a local governing body "can be sued directly under § 1983 for

20   monetary . . . relief where . . . the action that is alleged to be unconstitutional implements

21   or executes a policy statement, ordinance, regulation, or decision officially adopted and

22   promulgated by that body's officers," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690

(1978), Plaintiffs' complaint is devoid of any allegations of a relevant policy statement, ordinance, regulation, or decision DCYF or CRPD officers officially adopted and promulgated. (*See generally* Compl.) *See also Saved Mag. v. Spokane Police Dep't*, 505 F. Supp. 3d 1095, 1106 (E.D. Wash. 2020) (dismissing claim for failure to "allege any facts support that Officer Doe's actions were pursuant to the policy quoted in the Amended Complaint or reflective of any widespread custom by the [police department]").

As to Plaintiffs' claims for negligent investigation of medical child abuse, negligent placement, intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation, however, the court grants Plaintiffs' motion for leave to amend.

2. <u>Second Motion for Leave to Amend</u>

Plaintiffs' second motion seeks leave to drop the Washington Court Appointed Special Advocate Association as a defendant and instead "add the correct entity, King County, and to correct errors in Plaintiff's original Complaint which have become apparent in the course of briefing on the multiple motions to dismiss." (2d MFL at 1-2.) The court grants the request for leave to amend to add Ms. Whalen's employer, King County Dependency Court Appointed Special Advocate Association, as a defendant.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS the SCH Defendants' motion to dismiss (Dkt. # 16), GRANTS Ms. Whalen's motion to dismiss (Dkt. # 18), and GRANTS DCYF's motion to dismiss (Dkt. # 32).  The court GRANTS in part and

1   DENIES in part Plaintiffs' first motion for leave to amend their complaint (Dkt. # 22) and

2   GRANTS Plaintiffs' second motion for leave to amend their complaint (Dkt. # 45).

3   Plaintiffs shall file an amended complaint consistent with the rulings in this order by no

4   later than **July 8, 2024**.

5        Dated this 1st day of July, 2024.

6

7        JAMES L. ROBART
         United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 29